Appeal No. 2017-1667

# United States Court of Appeals
*for the*
# Federal Circuit

ALEXANDER ALIMANESTIANU, IOANA ALIMANESTIANU, individually and as executrix of the Estate of Mihai Alimanestianu, IRINA ALMANESTIANU, JOANNA ALIMANESTIANU, KATHY ALIMANESTIANU, executrix of the Estate of Serban Alimanestianu, NICHOLAS ALIMANESTIANU, PAULINE ALIMANESTIANU, executrix of the Estate of Constantin Alimanestianu, SIMONE DESIDERIO, executrix of the Estate of Calin Alimanestianu,

*Plaintiffs-Appellants,*

– v. –

UNITED STATES,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN CASE NO. 1:14-CV-00704-MCW, HONORABLE MARY ELLEN COSTER WILLIAMS

## BRIEF FOR PLAINTIFFS-APPELLANTS

RICHARD N. CHASSIN
JESSE T. CONAN
BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI LLP
299 Park Avenue, 16th Floor
New York, New York 10171
(212) 888-3033

*Attorneys for Plaintiffs-Appellants*

**FORM 9. Certificate of Interest**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Alimanestianu, et al. v. United States

No. 17-1667

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) Appellant, Alimanestianu certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

Alexander Alimanestianu, Ioana Alimanestianu, Irina Alimanestianu, Joanna Alimanestianu, Kathy Alimanestianu, Nicholas Alimanestianu, Pauline Alimanestianu, Simone Desiderio

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

4. ☑ There is no such corporation as listed in paragraph 3.

5. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Richard N. Chassin, Michael Zeb Landsman, and Jesse T. Conan of Becker, Glynn, Muffly, Chassin & Hosinski LLP

6 March 2017
Date

[signature]
Signature of counsel

Richard N. Chassin
Printed name of counsel

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iv

STATEMENT OF RELATED CASES .......... 1

PRELIMINARY STATETMENT .......... 2

JURISDICTIONAL STATEMENT .......... 3

QUESTIONS PRESENTED FOR REVIEW .......... 4

STATEMENT OF THE CASE .......... 4

The Taking and the Claims Settlement Agreement .......... 6

Historical and Legislative Background .......... 8

The United States Admission .......... 10

A Public Good and Just Compensation .......... 11

PROCEDURAL HISTORY .......... 14

DECISION BELOW .......... 15

SUMMARY OF ARGUMENT .......... 16

RELATED CASE:
*Aviation & General Insurance Co. et al. v. United States*,
Federal Circuit (16-1289) .......... 17

STANDARD OF REVIEW .......... 18

ARGUMENT .......... 19

I. THE TRIAL COURT ERRED IN DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT .......... 19

A. The Trial Court Correctly Held That the Plaintiffs Possessed Cognizable Property Interests Under the Takings Clause ....................20

1. Judgments on Appeal or Accrued Causes of Action Are Species of Property Protected by the Fifth Amendment ....................21

a. Under Federal Circuit Precedent, an Espoused Claim (or Judgment) is Property Under the Just Compensation Clause of the Fifth Amendment ....................21

b. Claims, Judgments, and Proceeds of Claims Share the Quintessential Characteristics of Classic Property —the Right to Possess, Use, and Dispose ....................25

c. Claims Are Cognizable Property Interests if the Underlying Right They Seek to Enforce Is Cognizable ....................26

2. The United States Asserts an Unprecedented Power to Use Eminent Domain to Acquire The "Non-Final" Causes of Action of Its Citizens Without the Payment of Just Compensation ....................28

B. The Takings Clause Imposes a Categorical Duty Upon the United States to Pay Just Compensation for the Acquired Property ....................34

1. *Horne* Holds That When the Government Takes Possession of Protected Private Property, It Must Pay Just Compensation to the Target of the Taking ....................34

a. When The United States Seizes Private Property, the Fifth Amendment Imposes a Categorical Duty Upon The Government To Pay Just Compensation ....................35

b. The Claims Against Libya (and Judgment on Appeal) Were Transferred from the Alimanestianu Plaintiffs To the United States ........ 38

2. In Light of the Property Transfer from the Alimanestianu Plaintiffs to the Government, the Penn Central Factors are Precluded by *Horne* ........ 40

3. Compensation Received from the Commission Does Not Alter the *Per Se* Takings Analysis ........ 45

4. Horne's Categorical Rule, as Applied to the Espousal of Claims, Aligns with the Historical Understanding of the Takings Clause, Found in the Court of Claims Decision, *Gray v. United States* ........ 45

C. Even if, *Arguendo*, the Regulatory Paradigm Followed by *Abrahim-Youri* Applies, Plaintiffs Still Establish a Compensable Taking ........ 49

1. The Commission Did Not Provide Reasonable Compensation to the Plaintiffs ........ 50

2. The Commission Was Not a True Alternative Forum ........ 52

3. There is No Basis in the Record For the Trial Court's Evident Attempt to Value Plaintiffs' Claims ........ 55

**CONCLUSION AND RELIEF ........ 56**

# TABLE OF AUTHORITIES

**Cases** **Page**

*A & D Auto Sales, Inc. v. United States*,
748 F.3d 1142 (Fed. Cir. 2014)....................41

*Abrahim-Youri v. United States*,
139 F.3d 1462 (Fed. Cir. 1997).................... passim

*Acceptance Ins. Cos. v. United States*,
583 F.3d 849 (Fed. Cir. 2009)....................19

*Adams v. United States*,
391 F.3d 1212 (Fed. Cir. 2004)....................21, 26-27

*Air Pegasus of D.C,. Inc. v. United Sates*,
424 F.3d 1206 (Fed. Cir. 2005)....................24

*Alliance of Descendants of Tex. Land Grants v. United States*,
37 F.3d 1478 (Fed. Cir. 1994)....................16, 21, 22-23

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................19

*Arbour v. Jenkins*,
903 F.2d 416 (6th Cir. 1990)....................32

*Aviation & Gen. Ins. Co. v. United States*,
121 Fed. Cl. 357 (Fed. Cl. 2015)....................24

*Axel Johnson Inc. v. Arthur Andersen & Co.*,
6 F.3d 78 (2d Cir. 1993)....................31

*Belk v. United States*,
858 F. 2d 706 (Fed. Cir. 1988)....................41

*Bridge Aina Le'a, LLC v. State Land Use Comm'n*,
2016 U.S. Dist. LEXIS 24224 (D. Haw. Feb. 29, 2016)....................42

*Cal. Fed. Bank, FSB v. United States*,
245 F.3d 1342 (Fed. Cir. 2001)....................19

*Casitas Mun. Water Dist. v. United States*,
543 F.3d 1276 (Fed. Cir. 2008)....................................................................19

*Casitas Mun. Water Dist. v. United States*,
708 F.3d 1340 (Fed. Cir. 2013)....................................................................18

*Cent. States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc.*,
960 F.2d 1339 (7th Cir. 1992)......................................................................31

*Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*,
651 F.2d 800, 814 (1st Cir. 1981) ............................................................ 22, 52

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) ............................................................................ 22, 33, 52

*Dimare Fresh, Inc. v. United States*,
808 F.3d 1301 (Fed. Cir. 2015)....................................................................36

*District of Columbia v. Beretta U.S.A. Corp.*,
940 A.2d 163 (D.C. 2008)...........................................................................30

*Gray v. United States*,
21 Ct. Cl. 340 (1886)............................................................................ 46, 47, 48

*Hammond v. United States*,
786 F.2d 8 (1st Cir. 1986) ...........................................................................31

*Horne v. Dep't of Agric.*,
135 S. Ct. 2419 (2015) .......................................................................... passim

*Ileto v. Glock, Inc.*,
565 F.3d 1126 (9th Cir. 2009)......................................................................30

*In re Estate of Walton*,
20 A.D.2d 386, 247 N.Y.S.2d 21, (N.Y. 1st Dep't 1964) ..................................25

*In re TMI*,
89 F.3d 1106 (3d Cir. 1996)..........................................................................32

*LMWT Realty Corp. v. Davis Agency, Inc.*,
85 N.Y.2d 462, 626 N.Y.S.2d 39 (N.Y. 1995) .................................................25

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003, 112 S.Ct. 2886 (1992) .......... 41, 50

*Lumbermens Mut. Cas. Co. v. United States*,
654 F.3d 1305 (Fed. Cir. 2011) .......... 24

*Lyon v. Agusta S.P.A.*,
252 F.3d 1078 (9th Cir. 2001) .......... 31

*Marks v. United States*,
15 Cl. Ct. 609 (1988) .......... 31, 52

*Mem'l Hosp. v. Heckler*,
706 F.2d 1130 (11th Cir. 1983) .......... 31

*Pa. Coal Co. v. Mahon*,
260 U.S. 393 (1922) .......... 32

*Palm Beach Isles Assocs. v. United States*,
231 F.3d 1354 (Fed. Cir. 2000) .......... 42

*Preseault v. United States*,
100 F.3d 1525 (Fed. Cir. 1996) .......... 26

*Rodgers v. Tristar Prods.*,
559 Fed. Appx. 1042 (Fed. Cir. 2012) .......... 31

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) .......... 25

*Salmon v. Schwarz*,
948 F.2d 1131 (10th Cir. 1991) .......... 32

*Shanghai Power Co. v. United States*,
4 Cl. Ct. 237 (Ct. Cl. 1983) .......... 21

*Stauffer v. Brooks Bros. Grp.*,
758 F.3d 1314 (Fed. Cir. 2014) .......... 31

*Tex. Am. Oil Corp. v. U.S. Dep't of Energy*,
44 F.3d 1557 (Fed. Cir. 1995) .......... 24

*Tex. State Bank v. United States*,
423 F.3d 1370 (Fed. Cir. 2005)....................18

*United States v. Hubbell*,
323 F.2d 197 (5th Cir. 1963)....................26

*Wischan v. Adler (In re Wischan)*,
77 F.3d 875 (5th Cir. 1996)....................26

**Statutes**

11 U.S.C. §§ 323(a) ....................26

11 U.S.C. §§ 541(a) ....................26

28 U.S.C. § 1295(a)(3)....................4

28 U.S.C. § 1491....................3

N.Y. Gen. Oblig. § 13-103 (McKinney 2015)....................24

RCFC 56(a)....................19

**Other Authorities**

Emer de Vattel, The Law of Nations, (1793) ....................48

Paul Finkelman, Foreign Law and American Constitutional Interpretation: A Long and Venerable Tradition, 63 N.Y.U. ANN. SURV. AM. L. (2007) ....................48

Peter Onuf & Nicholas Onuf, Federal Union, Modern World: The Law of Nations in an Age of Revolutions 1776-1814, (1993) ....................48

Robert J. Reinstein, Executive Power and The Law Of Nations in the Washington Administration, 46 U. RICH. L. REV. (2012) ....................48

## STATEMENT OF RELATED CASES

*Aviation & Gen. Ins. Co., et al. v. United States* (No. 14-687) and *Aureus Capital Managers, Ltd,. et al. v. United States* (No. 14-703) were actions consolidated before Judge Thomas C. Wheeler in the Court of Federal Claims arising out of the government's normalization of its relations with Libya in 2008 and 2009 (together, "*Aviation*"). Like this case, *Aviation* is on appeal to this Court (*Aviation, et al. v. United States*, No. 16-2389). *See also discussion below* at 17-18.

## PRELIMINARY STATETMENT

The plaintiffs-appellants in this lawsuit (the "Alimanestianu Plaintiffs") are all close relatives of Mihai Alimanestianu ("Mihai"), an American and victim of state-sponsored terror. Mihai was killed in 1989 by agents of The Socialist People's Libyan Arab Jamahirya ("Libya") when they downed UTA Flight 772 in southeastern Niger, killing all onboard.

In 1996, Congress amended the Foreign Sovereign Immunities Act ("FSIA") by removing the jurisdictional immunity of Libya and other designated state sponsors of terror to allow victims and their families to seek monetary damages for acts of terror in federal court. Prior to 1996, American victims of Libyan terror had claims against Libya but no forum, either in the United States or abroad. In 2002, the Alimanestianu Plaintiffs filed a lawsuit against Libya for the 1989 bombing. On August 8, 2008, after years of contested litigation, the United States District Court for the District of Columbia awarded the Alimanestianu Plaintiffs, collectively, a $1.3 billion judgment. Libya appealed. Days later, the judgment was taken by the United States and compromised.

The taking occurred on August 14, 2008, when the United States entered a Claims Settlement Agreement with Libya. The agreement came in the context of restoring full diplomatic, legal, and commercial relations between Libya and the United States and provides that it was entered "to further the process of

normalization of relations on the basis of equality and mutual benefit." As part of that agreement, the United States acquired and settled the claims (including judgments on appeal) of U.S. nationals against Libya arising out of Libya's decades-long campaign of terror.

In an executive order, dated October 31, 2008, President George W. Bush explained that as a result "no United States national may assert or maintain any claim . . . in any forum, domestic or foreign." Subsequently, on October 31, 2008, Libya's sovereign immunity was restored; from the Alimanestianu Plaintiffs' perspective, a meaningless act given that the U.S. had already taken and compromised their judgment. As compensation for the acquired property, the United States paid nothing to four of the Alimanestianu Plaintiffs, $200,000 to four of the Alimanestianu Plaintiffs, and $10 million to the Estate of Mihai.

At stake is the pivotal question of whether the United States must pay "just compensation" to its citizens under the Fifth Amendment when it acquires (as opposed to impairs) their right to seek redress for an injury.

## JURISDICTIONAL STATEMENT

The United States Court of Federal Claims (the "Trial Court") had subject matter jurisdiction over this takings action pursuant to the Tucker Act, 28 U.S.C. § 1491. The Trial Court entered a final judgment on December 30, 2016, granting the government's motion for summary judgment and denying the Alimanestianu

Plaintiffs' motion for partial summary judgment. Plaintiffs timely filed a notice of appeal on February 13, 2017. Appx18. This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(3).

## QUESTIONS PRESENTED FOR REVIEW

1. Whether plaintiffs' property (claims and a final judgment that was on appeal) is cognizable under the Takings Clause of the Fifth Amendment.

2. Whether that property is taken, under the *per se* takings rule adopted by *Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015), when ownership of the claims and judgment has been transferred from the plaintiffs to the United States of America (espousal) and subsequently compromised in connection with a settlement agreement between the United States and Libya.

3. If (*arguendo*) *Horne* is inapplicable, whether plaintiffs have established a taking within the regulatory paradigm employed by *Abrahim-Youri v. United States*, 139 F.3d 1462 (Fed. Cir. 1997).

## STATEMENT OF THE CASE

Mihai Alimanestianu ("Mihai"), a U.S. citizen, was killed by an act of state-sponsored terror—Libya's 1989 bombing of UTA Flight 772 in southeastern Niger. Appx2, Appx22, Appx146. The Alimanestianu Plaintiffs are all U.S.

citizens and close relatives of Mihai (spouse, siblings, and children). Appx2, Appx22-23. In 2002, the Alimanestianu Plaintiffs, together with the families of the other American victims of that terrorist act, filed an action against Libya and certain Libyan officers (collectively, the "Libyan Defendants") in the United States District Court in the District of Columbia—*Pugh, et al. v. The Socialist People's Libyan Arab Jamahirya, et al., Civil Action No. 02-2026-HHK* (the "Pugh Action"). Appx2, Appx20-21, Appx23.

The complaint in the Pugh Action alleged that the Libyan Defendants downed UTA Flight 772 and asserted various state and federal common law and statutory claims against them. Appx2, Appx24. Libya appeared and defended itself. On January 24, 2008, the United States District Court for the District of Columbia granted summary judgment to the Pugh Action plaintiffs. The judgment was first entered on February 7, 2008, and re-entered on August 8, 2008 as final. Appx2, Appx 24, Appx154. The total damages awarded in the Pugh Action were $6,903,683,445.00. Appx2. The damages specifically awarded to the Alimanestianu Plaintiffs were, in the aggregate, $1,297,336,632.00, broken down as follows:

a. The Estate of Mihai was awarded $54,453,877 against Libya and $163,361,631 against the Libyan officers;
b. Ioana Alimanestianu (wife of Mihai) was awarded $76,728,208 against Libya and $230,184,624 against the Libyan officers;

c. Joanna Alimanestianu (daughter of Mihai) was awarded $30,091,546 against Libya and $90,274,638 against the Libyan officers;

d. Nicholas Alimanestianu (son of Mihai) was awarded $30,091,546 against Libya and $90,274,638 against the Libyan officers;

e. Irina Alimanestianu (daughter of Mihai) was awarded $30,091,546 against Libya and $90,274,638 against the Libyan officers;

f. Alex Alimanestianu (son of Mihai) was awarded $30,091,546 against Libya and $90,274,638 against the Libyan officers;

g. The Estate of Calin Alimanestianu (brother of Mihai) was awarded $24,261,963 against Libya and $72,785,889 against the Libyan officers;

h. The Estate of Serban Alimanestianu (brother of Mihai) was awarded $24,261,963 against Libya and $72,785,889 against the Libyan officers; and

i. The Estate of Constantin Alimanestianu (brother of Mihai) was awarded $24,261,963 against Libya and $72,785,889 against the Libyan officers.

Appx2, Appx24, Appx 148. The $1.3 billion award to the Alimanestianu Plaintiffs is referred to as the "Judgment."

**<u>The Taking and the Claims Settlement Agreement</u>**

The Libyan Defendants immediately filed an appeal in the Pugh Action. Appx2. Shortly thereafter, however, the United States took and compromised the Judgment. Specifically, on August 14, 2008, just six days after the Judgment was entered, the United States entered into a "Claims Settlement Agreement" with Libya. Appx2, Appx29-32.

The Claims Settlement Agreement states that it was entered by the United States and Libya "to further the process of normalization of relations on the basis of equality and mutual benefit." Appx29. Article I explains that the agreement

will result in "a final settlement of the Parties' claims, and those of their nationals (including natural and juridical persons)," which included the Judgment held by the Alimanestianu Plaintiffs. *Id*.

Article II explains the basis for the compromise: "[t]he two Parties agree to authorize the establishment of a humanitarian settlement fund as the basis for settling the claims and terminating and precluding the suits specified in Article I." Appx30. An annex attached to the agreement provides more details. Specifically, a $1.8 billion humanitarian fund ("Fund") would be established and divided into two parts—$1.5 billion dollars for the United States (presumably to be distributed to the U.S. victims of Libyan terrorism) and $300 million dollars for Libya (presumably to be distributed to the Libyan victims of U.S. airstrikes). Appx32.

Finally, Article III(1)—the crux of the taking—provides that "[e]ach Party [defined as the United States and Libya] shall accept the resources for distribution ***as a full and final settlement of its claims and suits <u>and those of its nationals</u>*** as specified in Article I." Appx30 (emphasis added). The agreement further provided that, upon the receipt of that money, each nation would extend sovereign and diplomatic immunity to the other. *Id*. Consequently, the claims of the Alimanestianu Plaintiffs were espoused (taken) and compromised by the United States when it entered the Claims Settlement Agreement on August 14, 2008.

## Historical and Legislative Background

In 2003, Libya abandoned its weapons of mass destruction and renounced terrorism. *See* Appx43.[1] In 2006, formal diplomatic relations between the two countries were restored, but the legal and commercial relationship had yet to normalize. Appx44 ("Libyan officials expressed dissatisfaction with the pace and scope of normalization with the United States and alleged that Libya had not gotten what was promised when it decided to abandon weapons of mass destruction and terrorism in 2003"). Of particular concern to Libya were a series of laws that had stripped state sponsors of terror, such as Libya, of their sovereign immunity and the related lawsuits pending in the United States, one of which was the Pugh Action. Appx44-45 ("the enactment by Congress of changes in terrorism liability provisions and the awarding of significant monetary damages to the families and estates of U.S. victims of the 1989 bombing of UTA Flight 772 heightened the intensity of U.S.-Libyan engagement on outstanding terrorism claims."). The United States, for its part, wanted to show that Libya made "the right decision" in abandoning weapons of mass destruction and eschewing terrorism. Appx45 ("the Bush Administration publicly underscored its desire 'to show the Libyans that they made the right decision' in abandoning weapons of mass destruction and

[1] A 2011 report authored by the Congressional Research Service for members of Congress (Appx33-77) summarizes the historical backdrop that led to the Claims Settlement Agreement (Appx29-32).

eschewing terrorism"). It also wanted to ensure that U.S. companies would be able to participate in the Libyan economy.[2]

Congress responded to this state of affairs with the Libyan Claims Resolution Act (the "Act"), dated August 4, 2008. The Act provided that Libya's sovereign immunity would be contingently restored, but only if the United States (1) entered into a "claims agreement" with Libya in which it compromised the terrorism-related claims of U.S. nationals against Libya and (2) the Secretary of State submitted a certification to the appropriate congressional committee that the United States has received sufficient funds to compensate the victims of Libya's state-sponsored terror. *See* Appx78-82. Libya's sovereign immunity was finally restored on or about October 31, 2008, when Secretary of State Condoleezza Rice submitted the required certification to Congress—nearly two months after the Claims Settlement Agreement was entered and the United States had compromised the Judgment. Appx25-26, Appx82-84.

[2] The report provides that "[t]he Libyan government responded to congressional pressure with increasingly direct statements warning that if its relations with the U.S. government and U.S. business community remained complicated by outstanding terrorism claims, U.S. companies could miss opportunities to bid on lucrative Libyan government contracts to refurbish and expand the country's infrastructure. The Administration and the U.S. business community supported normalization with Libya . . ." Appx44.

**The United States Admission**

The United States has admitted that its use of eminent domain to "espouse" the claims of the Alimanestianu Plaintiffs resulted in a title transfer from the Alimanestianu Plaintiffs to the government. In its briefing to the United States Court of Appeals for the D.C. Circuit, when the government intervened in the Pugh Action and moved for dismissal, the government told the court that it had "espous[ed] the claims against Libya," which "made the plaintiffs' claims its own," and that it was "now the real party in interest:"

> The United States has espoused the terrorism-related claims of U.S. nationals against Libya, including plaintiffs' claims. The United States' espousal is pursuant to a claims settlement agreement with the Libyan government, reached as part of a restoration of diplomatic relations with Libya, and involving payment by Libya of a large sum for the benefit of U.S. nationals. **In espousing the claims against Libya, the United States has made the plaintiffs' claims its own.** Because the United States is now the real party in interest, the Court should permit it to intervene in this suit as plaintiff-appellee.

Appx26, Appx86 (emphasis added); *see also* Appx3; *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 2009 U.S. App. LEXIS 4142, at *3-4 (D.C. Cir. Feb. 27, 2009) (vacatur necessary to ensure judgment has no legal consequence that could cause the United States to breach its obligations to Libya under the Claims Settlement Agreement). Thus, the public record confirms that the taking occurred on August 14, 2008—before the change in law, when the United States

compromised the claims of its nationals—not on October 31, 2008, when Libya's sovereign immunity was restored and U.S. jurisdiction removed.

The essential point here is that the restoration of Libya's sovereign immunity was of no consequence to the Alimanestianu Plaintiffs because, as of August 14, 2008, the Alimanestianu Plaintiffs no longer held a judgment or claims against Libya. Dismissal of the Pugh Action was required by the government's taking and settlement of those claims.

**<u>A Public Good and Just Compensation</u>**

The Claims Settlement Agreement explains that it was entered for a public benefit: "to further the process of normalization of relations on the basis of equality and mutual benefit." Appx29. Libya's borders were further opened to U.S. commerce and the United States was able to demonstrate to the world the tangible benefits of renouncing terrorism.

The United States gained that public good, however, by using the claims held by the victims of Libyan terror as a bargaining chip when it took and compromised those claims. Each of the Alimanestianu Plaintiffs had their claims and judgment confiscated by the government and settled by the Claims Settlement Agreement. The State Department later established the rules for partial, limited compensation of those whose property was taken and compromised. The State

Department first chose to pay $10 million to the estates of those who died at the hands of Libyan terror, including the Estate of Mihai. *See* Appx4.

The State Department then established seven additional categories of claimants who were entitled to partial compensation from the Fund. The State Department recommended the amount that should be awarded to each claimant who demonstrated that he or she met those threshold requirements. *See* Appx4, Appx127-133. The category applicable to the Alimanestianu Plaintiffs (other than the Estate of Mihai) is Category B:

> Category B: This category shall consist of claims of U.S. nationals for mental pain and anguish who are living close relatives of a decedent whose death formed the basis of a death claim compensated by the Department of State provided that (1) the claim was set forth as a claim for emotional distress, solatium, or similar emotional injury by the claimant named in the Pending Litigation; (2) the claimant is not eligible for compensation from the associated wrongful death claim, and the claimant did not receive any compensation from the wrongful death claim; (3) the claimant has not received any compensation under any other part of the Claims Settlement Agreement, and does not qualify for any other category of compensation in this referral; and (4) the Pending Litigation against Libya has been dismissed before the claim is submitted to the Commission. We believe and recommend that a fixed amount of $200,000 would be an appropriate level of compensation for a claim that meets the applicable standards under Category B.

Appx128. The State Department referred administration of these claims to the Foreign Claims Settlement Commission of the United States (the "Commission"), which was tasked with (a) determining whether a putative claimant met the threshold requirements and (b) fixing the amount of compensation. *Id.* Four of the

eight Alimanestianu Plaintiffs (not including the Estate of Mihai) did not meet those threshold requirements. The Estates of Calin, Serban, and Constantine Alimanestianu were not entitled to compensation because they were not "living" at the time of the referral to the Commission. And Ioana Alimanestianu was not entitled to a payment because she was the beneficiary of the Estate of Mihai and thus "eligible for compensation from the associated wrongful death claim." *Id.* The Commission determined that Mihai's children met the threshold requirements of Category B, and each was entitled to the recommended fixed compensation of $200,000. Appx4.

The compensation paid by the United States for the confiscated property amounted to, at most, pennies on the dollar:

a. The United States paid Ioana **nothing** in exchange for her judgment against the Libyan Defendants of **$306,912,832**;
b. The United States paid Joanna **$200,000** in exchange for her judgment against the Libyan Defendants of **$120,366,184**;
c. The United States paid Nicholas **$200,000** in exchange for his judgment against the Libyan Defendants of **$120,366,184**;
d. The United States paid Irina **$200,000** in exchange for her judgment against the Libyan Defendants of **$120,366,184**;
e. The United States paid Alex **$200,000** in exchange for his judgment against the Libyan Defendants of **$120,366,184**;
f. The United States paid The Estate of Mihai **$10 million** in exchange for its judgment against the Libyan Defendants of **$217,815,508**;
g. The United States paid the Estate of Calin **nothing** in exchange for its judgment against the Libyan Defendants of **$97,047,852**;

h. The United States paid the Estate of Serban **nothing** in exchange for its judgment against the Libyan Defendants of $**97,047,852**; and
i. The United States paid the Estate of Constantin **nothing** in exchange for its judgment against the Libyan Defendants of **$97,047,852**.

Appx4-5. Just compensation has not been paid.

## PROCEDURAL HISTORY

On August 4, 2014, the Alimanestianu Plaintiffs filed a complaint against the United States in the U.S. Court of Federal Claims alleging that the United States used its powers of eminent domain to seize their private property and failed to pay just compensation in violation of the Takings Clause of the Fifth Amendment.

On November 13, 2014, the United States filed a motion to dismiss asserting that the plaintiffs had not alleged a cognizable property interest and that no taking had occurred. On October 29, 2015, the Trial Court denied the motion to dismiss, holding that plaintiffs did possess a cognizable property interest and deferred the question of whether a taking had occurred for summary judgment or trial. *Alimanestianu v. United States*, 124 Fed. Cl. 126 (Fed. Cl. 2015); Appx136-144.

On February 24, 2016 and April 25, 2016, the parties filed cross-motions for summary judgment. On December 29, 2016, the Trial Court issued a decision denying the plaintiffs' motion for partial summary judgment and granting summary judgment to the defendants. *Alimanestianu*, 130 Fed. Cl. at 137; Appx1-

11. And on December 30, 2016 the Trial Court entered its judgment, dismissing the lawsuit. Appx12.

## DECISION BELOW

The Trial Court decision (130 Fed. Cl. 137) addressed the two stages of a takings analysis: (1) whether the claimant identified a cognizable property interest and (2) whether that property interest was taken.

The Trial Court first considered whether the plaintiffs possessed a cognizable property interest under the Takings Clause. The court declined to reverse its earlier ruling. Appx141 (denying defendants motion to dismiss and holding that "the Federal Circuit has recognized that a cause of action may be a cognizable property interest."). Relying on what it referred to as *dicta* in *Abrahim-Youri v. United States*, 139 F.3d 1462 (Fed Cir. 1997), the Trial Court found that the plaintiffs possessed a cognizable property interest under the Takings Clause: "a cause of action against a foreign government that the United States Government espoused as its 'claim' and settled, was a property interest." Appx7.

The Trial Court next considered whether that property interest was taken. Plaintiffs argued, under the new rule announced by the Supreme Court in *Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015), that the transfer of their property to the federal government was a categorical *per se* taking that required payment of just compensation. The Trial Court, however, ignored the rule of *Horne*. Instead,

relying on *Abrahim-Youri v. United States*, a Federal Circuit decision from 1997, the Trial Court engaged in a regulatory takings analysis despite the property transfer to the government. Appx6-10. The Trial Court held that, under the *Penn Central* factors, no taking had occurred.

## SUMMARY OF ARGUMENT

A takings claim analysis has two steps. First, the Court must determine whether the plaintiff has identified a cognizable property interest. If the answer to that question is yes, the Court then assesses whether that interest was taken.

In Section I-A, we show that the Plaintiffs have identified a cognizable property interest. Twice in the last 25 years this Court has considered whether claims, such as those held by the Alimanestianu Plaintiffs, are cognizable property interests when they are espoused by the United States. In each case, the Court held that they are. *See Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994); *Abrahim-Youri v. United States*, 139 F.3d 1462 (Fed Cir. 1997).

In Section I-B, we argue, under the 2015 decision *Horne v. Dep't of Agriculture*, that the Supreme Court adopted a bright-line between regulatory and *per se* takings. Where a cognizable property interest is transferred to the government, as the espoused claims and Judgment were here, the government has

effected a *per se* taking and the Fifth Amendment mandates the payment of just compensation.

Finally, in Section I-C, we contend that, even under the Federal Circuit rules in place prior to *Horne*, there has been a taking. In *Abrahim-Youri*, this Court held that the espousal of claims should be analyzed under the *Lucas* regulatory paradigm. *Id.* at 1467-68. *Abrahim-Youri* requires that the government provide compensation that is reasonable in light of the circumstances of the taking. The government cannot meet this standard for any of the Alimanestianu Plaintiffs, particularly the four who were denied any compensation for their property.

**RELATED CASE:**
***Aviation & General Insurance Co. et al. v. United States*,**
Federal Circuit (16-1289)

*Aviation* is a related lawsuit pending in this Court. The plaintiffs in Aviation alleged and argued that the government affected an administrative taking when it restored Libya's sovereign immunity, thereby stripping the federal courts of jurisdiction to adjudicate their claims against Libya. While *Aviation* and this case share numerous common facts, there is one fundamental difference. In *Aviation*, the government did not appropriate the claims of the Aviation plaintiffs since they were not U.S. citizens. Recall that the Claims Settlement Agreement in Article III(1) compromised only the claims of citizens of the United States and Libya as a "full and final settlement of its claims and suits and those of its nationals."

Appx30. Unlike here, the government in *Aviation* did not use its powers of eminent domain to acquire private property. *See generally Aviation*, 127 Fed. Cl. 316.

In granting the government's motion for summary judgment, Judge Wheeler held that, though the claims of the plaintiffs were cognizable property interests under the Takings Clause, the claims were not "taken" when the government restored Libya's sovereign immunity and stripped the federal courts of jurisdiction to adjudicate their claims. *Id.*

The threshold legal issue in *Aviation* (whether claims against Libya are cognizable property interests under the Takings Clause) is similar, if not identical, to the threshold legal issue here (whether claims against Libya *and a judgment on appeal* are cognizable property interests). But with respect to the second phase of the takings inquiry, whether government action effected a compensable taking, *Aviation* concerns a regulatory taking while this case implicates a per se taking.

**STANDARD OF REVIEW**

The issues presented on appeal are pure questions of law requiring *de novo* review. *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1351 (Fed. Cir. 2013) ("The nature or scope of a compensable property interest in a takings analysis is a question of law" that is reviewed *de novo*.)*; see also Tex. State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir. 2005). So, too, is the Trial

Court's grant or denial of summary judgment. *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001).

A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed. Cir. 2008). The court's role is not to weigh evidence, only to determine whether or not "there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The salient facts are not in dispute.

## ARGUMENT

### I. THE TRIAL COURT ERRED IN DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This Court has established a two-part test for determining whether a governmental action constitutes a taking under the Fifth Amendment: "[f]irst, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009).

Here, the Trial Court correctly found that the plaintiffs' possessed a cognizable property interest. Appx7, Appx141. The Trial Court erred, however, in its approach to the second prong of the analysis by ignoring the new rule announced by the Supreme Court in *Horne v. Dep't of Agric*. *Horne* holds that when the government takes possession of protected private property, of any kind, the Fifth Amendment imposes a categorical duty upon the government to pay just compensation: "[t]he Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home. . . . It protects 'private property' without any distinction between different types." 135 S. Ct. at 2426.

Here, despite the government's use of eminent domain to take actual possession of plaintiffs' property (as opposed to a regulatory or statutory impairment), the Trial Court, without explanation, declined to follow *Horne*. The decision is error and should be reversed.

### A. The Trial Court Correctly Held That the Plaintiffs Possessed Cognizable Property Interests Under the Takings Clause

The property interests of the Alimanestianu Plaintiffs are cognizable. The Trial Court correctly held that when the United States used its powers of eminent domain to seize the claims and judgments on appeal of its citizens against a foreign state (an action often referred to as espousal), the United States invaded a property interest protected by the Takings Clause of the Fifth Amendment. Appx7, Appx141.

### 1. Judgments on Appeal or Accrued Causes of Action Are Species of Property Protected by the Fifth Amendment

The property interests at issue are tort claims for wrongful death and emotional distress and the resulting Judgment obtained from the successful prosecution of those claims. The United States used its power of eminent domain to seize the Judgment, along with the underlying entitlement to relief. Those interests were traded by the United States when it entered the Claims Settlement Agreement with Libya providing a "full and final settlement of its claims and suits and those of its nationals." Appx30.

#### a. Under Federal Circuit Precedent, an Espoused Claim (or Judgment) Is Property Under the Just Compensation Clause of the Fifth Amendment

A cause of action (or judgment on appeal) is property within the meaning of the Takings Clause of Fifth Amendment. *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994) ("[b]ecause a legal cause of action is property within the meaning of the Fifth Amendment, claimants have properly alleged possession of a compensable property interest.") (citations omitted); *Adams v. United States*, 391 F.3d 1212, 1225-1226 (Fed. Cir. 2004) ("a cause of action may fall within the definition of property recognized under the Takings Clause"); *Shanghai Power Co. v. United States*, 4 Cl. Ct. 237, 241 (Ct. Cl. 1983) (claims against China arising out of China's expropriation of plaintiff's property were cognizable under the Takings Clause) *Aff.d*, 765 F.2d 159 (Fed. Cir.

1985) (table); *see also Dames & Moore v. Regan*, 453 U.S. 654, 691 (1981) (Powell, J., concurring) ("the government must pay just compensation when it furthers the Nation's foreign policy goals by using as bargaining chips claims lawfully held by a relatively few persons"); *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.*, 651 F.2d 800, 814 (1st Cir. 1981) ("[t]here may well be situations when the President's extinction or 'settlement' of a claim against a foreign government, without the consent of the claimant, would constitute a 'taking' of private property for a public 'use.'").

Twice in the last twenty-five years (in *Alliance of Descendants* and *Abrahim-Youri*), this Court considered whether the espousal of claims by the United States in connection with a settlement agreement with a foreign power implicates a property interest protected by the Takings Clause. In each case, this Court held that it did.

*Alliance of Descendants* concerned agreements between the U.S. and Mexico. The plaintiffs were the heirs of Mexican nationals who had owned land in what is now Texas. Texas seized that land during the hostilities that followed its declaration of independence from Mexico in 1836. In 1923, the U.S. and Mexico created a commission to resolve the claims of Mexicans to the land seized by Texas and the claims of Texans to land seized by Mexico. In 1941, the U.S. and Mexico entered into an agreement releasing each other from liability for the claims

pending before the commission, thus settling the claims of each country's nationals against the other. Each country was expected to pay remuneration to its own citizens. The U.S. paid compensation to its own citizens but Mexico did not; the Mexicans sued the U.S., alleging a taking.

The Federal Circuit honed in on the property at issue—legal claims, not real property: "[t]he claimants do not in this suit allege a taking of the land in Texas itself. Rather they allege that the United States took away their legal right to sue for compensation for that land." *Alliance of Descendants,*37 F.3d at 1481. The Federal Circuit went on to hold without any limiting language that a legal claim is property under the Takings Clause: "***because a legal cause of action is property within the meaning of the Fifth Amendment*, *claimants have properly alleged possession of a compensable property interest***." *Id.* (citations omitted and emphasis added).

*Abrahim-Youri* arose out of the Algiers Accords. In 1990 the United States and Iran reached an agreement resolving small claims (those less than $250,000) still pending before an international arbitration panel. 139 F.3d at 1463-1464. The United States espoused the claims, settled them for $55 million, and referred the former owners of the claims to a commission for an adjudication of their right to recover from the settlement fund. By proceeding to the second stage of the takings analysis and analyzing whether the espousal constituted a taking (*Id.* at 1465-

1466), the Federal Circuit implicitly recognized, and thus maintained its holding in *Alliance of Descendants*, that a claim is a cognizable property interest. *See Air Pegasus of D.C,. Inc. v. United Sates*, 424 F.3d 1206, 1213 (Fed. Cir. 2005) ("we do not reach this second step without first identifying a cognizable property interest."). *See also Aviation & Gen. Ins. Co. v. United States*, 121 Fed. Cl. 357 (Fed. Cl. 2015) (explaining that "for purposes of determining a cognizable property interest, the Federal Circuit [in *Abrahim-Youri*] maintained its earlier position from *Alliance of Descendants* that causes of action against a foreign sovereign are property interests under the Fifth Amendment.").

The two prior Federal Circuit panels to consider the precise narrow issue of law before the Court held that an espoused claim is a cognizable property interest under the Takings Clause. It would represent a sharp break from Federal Circuit precedent to change course now. *See Tex. Am. Oil Corp. v. U.S. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) ("This court applies the rule that earlier decisions prevail unless overruled by the court *en banc*, or by other controlling authority such as intervening statutory change or Supreme Court decision."); *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1313 n.4 (Fed. Cir. 2011) (same).

b. Claims, Judgments, and Proceeds of Claims Share the Quintessential Characteristics of Classic Property—the Right to Possess, Use, and Dispose

The term *property*, as used in the Takings Clause, does not mean the actual physical or intangible object; rather, *property* denotes the cluster of rights that attaches to such an object, specifically, "the right to possess, use and dispose of it." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-1004 (1984) (trade secrets may be protected under the Takings Clause). Where intangible property can be possessed, used, and disposed (much like tangible or real property), it is protected by the Takings Cause.

The property at issue here—judgments, tort claims, and the proceeds of tort claims—possess such characteristics. Claims and judgments can be possessed, used, disposed, compromised, settled, and prosecuted. *See, e.g.,* N.Y. Gen. Oblig. § 13-103 (McKinney 2015) ("a judgment for a sum of money, or directing the payment of a sum of money, recovered upon any cause of action, may be transferred"); *In re Estate of Walton*, 20 A.D.2d 386, 390, 247 N.Y.S.2d 21, 25-26 (N.Y. 1st Dep't 1964) (an unliquidated personal injury claim is a property right against which a federal tax lien may be asserted); *LMWT Realty Corp. v. Davis Agency, Inc.*, 85 N.Y.2d 462, 467, 626 N.Y.S.2d 39, 42 (N.Y. 1995) ("because a cause of action is a species of property, an attorney acquires a vested property interest in the cause of action at the signing of the retainer agreement and thus a

title to property and rights to property.") (quotations omitted); *United States v. Hubbell*, 323 F.2d 197, 200 (5th Cir. 1963) (no distinction between tort and contract claims in connection with federal tax liens: "[w]e see no reason, however, why a [personal injury] tort claim is not property or rights to property, just as, e.g., any unliquidated contract claim") (quotations omitted); 11 U.S.C. §§ 323(a), 541(a); *Wischan v. Adler (In re Wischan)*, 77 F.3d 875, 877-878 (5th Cir. 1996) (both claims and judgments pass to a trustee in bankruptcy).[3]

Thus, even if this were an issue of first impression in this Court (and it is not), the characteristics of a tort claim, judgment, and the proceeds of a claim, would compel protection under the Takings Clause.

c. Claims Are Cognizable Property Interests if the Underlying Right They Seek to Enforce Is Cognizable

A point of law that emerges from Federal Circuit jurisprudence is that not all claims are created equal. The government argued before the Trial Court (and we assume it will do so again here) that under *Adams v. United States*, 391 F.3d 1212 (Fed. Cir. 2004), a tort claim is not cognizable property under the Takings Clause. The Trial Court correctly rejected the argument. Appx7.

[3] New York law is cited as most of the Alimanestianu plaintiffs were domiciled in New York and the underlying tort claims were principally brought under New York law. *See Preseault v. United States*, 100 F.3d 1525, 1556 (Fed. Cir. 1996) (it is generally "state law that creates the property rights to which Fifth Amendment rights attach").

The primary property interest in *Adams* was a statutory entitlement to overtime compensation under the Fair Labor Standards Act ("FLSA"). Under a long line of cases, a statutory entitlement to a payment from the government, such as overtime compensation, is not cognizable property under the Takings Clause. *Adams*, 391 F.3d at 1219-1225. The *Adams* plaintiffs maintained a derivative claim that the government had taken their administrative claim to recover their overtime compensation when it changed the statute of limitations from six to two years. This Court rejected the argument on the obvious and narrow grounds that if an entitlement to overtime compensation is not a cognizable property interest, a claim seeking to enforce that entitlement cannot plausibly be cognizable. *Id.* at 1226 (noting in dicta that Federal Circuit "precedent has limited the application of the Takings Clause to cases in which the cause of action protects a legally-recognized property interest.").

At most, *Adams* held that a claim is not a cognizable property interest if that claim is attempting to enforce an underlying entitlement that itself is not a cognizable property interest. In other words, a derivative claim is not a property interest where the claim seeks to obtain a benefit that has already been carved out from the bundle of property rights that are cognizable under the Takings Clause. The tort claims at issue here are not subject to such a limitation.

### 2. The United States Asserts an Unprecedented Power to Use Eminent Domain to Acquire The "Non-Final" Causes of Action of Its Citizens Without the Payment of Just Compensation

We expect the government to argue, as it did below, that a judgment on appeal or claim can never be property for purposes of the Fifth Amendment. The argument relies on a distinction between vested (protected) and unvested (unprotected) property interests. The government's position is that tort claims do not "vest" until they are prosecuted to final unappealable judgment. In effect, the government claims the unrestrained right to seize and then prosecute (or settle) the tort claims or judgments of any U.S. citizen without triggering the Fifth Amendment's requirement to pay just compensation to the injured party. Appx140-142. The contention is extraordinary.

The following hypotheticals illustrate the dangers of the government's anemic view of the Fifth Amendment:

***Hypothetical 1***: A factory pollutes a lake in a small Ohio town, killing the children who live in that town and swim in the lake. The town parents band together and bring wrongful death claims against the factory. The United States, sensing an opportunity to exert pressure on the factory without initiating a cumbersome environmental enforcement action, seizes and takes possession of the pending tort claims. The United States presses the factory to settle and the factory agrees to cease polluting, clean up the lake, and pay the United States $15 million

in full settlement of the wrongful death claims. Under the government's proffered formulation of the Takings Clause, since the tort claims of the parents were not final non-appealable judgments, the government has no constitutional obligation to pay any compensation to the parents for the seized claims.

***Hypothetical 2*:** A class action was asserted against Amazon, Apple, and other purveyors of electronic books, asserting that the companies had colluded to fix the prices of e-books. The plaintiffs prevailed and secured a $5 billion judgment, which was appealed by the defendants. During the pendency of the appeal, the United States saw an opportunity to reduce the deficit, seized the judgment on appeal, and substituted itself for the plaintiffs. Amazon and Apple proposed a settlement whereby they pay $4 billion dollars to the United States to compromise the claims. The United States agreed and added the payout to the Treasury. Under the government's formulation of the Takings Clause, no compensation to the class is required because the judgment was still on appeal.

The United States was unable to cite a single case in support of its contention that it may freely seize and then use any judgment on appeal or accrued claim because such claims have not "vested." In the cases cited below to support its position, courts, mostly in other circuits, considered due process or takings challenges to a law or regulation that affected a cause of action or lawsuit, either

diminishing its value or precluding it altogether. These cases deal with the government's interference with a property interest, not, however, outright seizure.

For instance, in one line of cases, a federal statute immunized gun manufacturers from liability for injuries caused by their firearms in crimes, including already-accrued state causes of action, such as wrongful death. Courts held that the statute did not constitute a taking of already-accrued state law claims of victims of gun violence. *See Ileto v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009) (law immunizing manufacturers and sellers of firearms from civil liability for injuries inflicted by criminals, including already-accrued state law causes of action, does not implicate Takings Clause); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 180-182 (D.C. 2008), *cert. denied*, 556 U.S. 1104 (2009) (same). The key distinction between the taking here and the alleged taking in *Ileto* is that, in *Ileto*, the government did not take possession of already accrued state law claims, settle them on whatever terms it deemed just, and retain the proceeds; the claims were merely burdened or precluded by a statutory defense.

The other cases relied on by the government below are essentially identical to *Ileto*. At most, they stand for the principle that protected property interests are not implicated when a claim or judgment on appeal is abrogated, diminished, enhanced, or precluded by a statute or regulation. In none of the cases is the entire

(or indeed any of the) cluster of property rights that accompanies an object transferred to the government. *See e.g.*:

- *Rodgers v. Tristar Prods.*, 559 Fed. Appx. 1042, 1045 (Fed. Cir. 2012) (change to the federal false marking statute eliminating *qui tam* actions and providing that only individuals who suffered a competitive injury had standing to bring a claim did not constitute a taking, even in connection with lawsuit that was pending); *Stauffer v. Brooks Bros. Grp.*, 758 F.3d 1314, 1321 (Fed. Cir. 2014) (same);

- *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1086 (9th Cir. 2001) (adoption of federal statute of repose precluding claims against airplane manufacturers where accident occurred more than 18 years after the aircraft was manufactured did not constitute a taking of accrued claims that were precluded as a result);

- *Axel Johnson Inc. v. Arthur Andersen & Co.*, 6 F.3d 78, 83-84 (2d Cir. 1993) (federal law amending statute of limitations for securities claims required reinstatement of dismissed causes of action, as time to appeal had not expired, and thus defendant had yet to acquire a vested right in the dismissal);

- *Cent. States, Southeast & Southwest Areas Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1345-1347 (7th Cir. 1992) (no vested right in decision awarding interim payment where decision inherently conditioned upon a final determination, which occurred after change in law that precluded basis for interim payment);

- *Hammond v. United States*, 786 F.2d 8, 12-15 (1st Cir. 1986) (law providing that a federal statutory remedy was the exclusive remedy for injuries arising out of atomic weapons testing was unlikely to be a taking of the now-precluded pending state law claims against government contractors);

- *Mem'l Hosp. v. Heckler*, 706 F.2d 1130, 1137-1138 (11th Cir. 1983) (changes to Medicare reimbursement formula while lawsuit pending did not implicate a vested property right such that a taking had occurred);

- *Marks v. United States*, 15 Cl. Ct. 609, 612 (1988) (no property interest in undomesticated foreign judgment; executive order precluding

domestication in any U.S. court and requiring submission to international arbitration panel for enforcement was not a taking);

- *In re TMI*, 89 F.3d 1106, 1113 (3d Cir. 1996) (law requiring application of different statute of limitations, rendering certain already-accrued claims time-barred, did not implicate a property right or offend due process);

- *Salmon v. Schwarz*, 948 F.2d 1131, 1143 (10th Cir. 1991) (law forcing persons injured by common law torts committed by federal employees within the scope of their employment to seek redress against the United States under the Federal Tort Claims Act, including individuals with already-accrued claims or judgments on appeal, did not implicate a vested property right for due process purposes); and *Arbour v. Jenkins*, 903 F.2d 416, 420 (6th Cir. 1990) (same).

These are functionally regulatory takings, not outright seizures—whether analyzed as such or not—because they all address laws that diminish or preclude already accrued claims and quite sensibly conclude that the government need not pay compensation whenever a law impacts the viability or value of an accrued claim. In the words of Justice Holmes: "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922). *See also Horne*, 135 S. Ct. at 2427-2428 (noting that the government's ability to regulate non-real property without effecting a taking is nearly infinite).

Here, however, the United States did not merely change a law which precluded the claims held by the Alimanestianu Plaintiffs (*i.e.*, the United States did not merely restore Libya's sovereign immunity, thus leaving the claims intact but removing the jurisdiction of the U.S. courts). The entitlement to relief and

Judgment was transferred from the Alimanestianu Plaintiffs to the government and used as a bargaining chip by the United States when it entered the Claims Settlement Agreement. The government provided a succinct explanation to the D.C. Circuit Court of Appeals: "[i]n espousing the claims against Libya, ***the United States has made the plaintiffs' claims its own [and] is now the real party in interest***". Appx86 (emphasis added). And President Bush confirmed that following the compromise, "no United States national may assert or maintain any claim . . . in any forum, domestic or foreign." Appx134.

Here, the United States received the proceeds of the Claims Settlement Agreement, which included cash as a well as innumerable intangible benefits, such as the normalization of diplomatic and legal relations with Libya as well as increased commercial opportunities for U.S. companies. The United States benefitted from the use of its power of eminent domain to take possession of and barter away the valuable property of the plaintiffs. *Dames & Moore*, 453 U.S. at 691 (Powell, J., concurring) ("the government must pay just compensation when it furthers the Nation's foreign policy goals by using as bargaining chips claims lawfully held by a relatively few persons"). The seizure implicates a protected property interest of the plaintiffs.

## B. The Takings Clause Imposes a Categorical Duty Upon the United States to Pay Just Compensation for the Acquired Property

*Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015), established a bright-line between takings to be analyzed within the *Penn Central/Lucas* regulatory framework and those subject to the rigid *per se* regime that imposes a categorical duty upon the government to pay just compensation. Following *Horne*, if a property interest is transferred to the government (a physical taking), the per se rules apply. If a property interest is merely regulated or impaired, the taking is evaluated under the *Penn Central/Lucas* regulatory paradigm. The Trial Court's error was its failure to appreciate the significance of *Horne*. Despite the heavy focus on *Horne* and its implications in the briefing below, the controlling Supreme Court decision was not cited by the Trial Court.

### 1. *Horne* Holds that the Government Must Pay Just Compensation Whenever it Takes Possession of Protected Private Property

The Takings Clause provides: "nor shall ***private property*** be taken for public use, without just compensation." U.S. Const., Amend. V (emphasis added). When private property is transferred to the government (as the claims and judgment on appeal were here), the government has effected a *per se* taking, and the Fifth Amendment imposes a categorical duty upon the government to pay just compensation for the acquired property. *Horne*, 135 S. Ct. at 2428. The Supreme Court rule announced in *Horne* superseded prior jurisprudence in the Federal

Circuit concerning the application of the per se taking regime, including the approach taken by the Federal Circuit in *Abrahim-Youri*.

The Trial Court's error is illuminated in its discussion of the *Abrahim-Youri* approach here:

> Without concluding that the government's espousal and settlement of the *Abrahim-Youri* plaintiffs' claims constituted a regulatory taking, the Circuit nonetheless pragmatically looked to the Penn Central factors as relevant to the analysis. The Court found the *Penn Central* factors relevant, recognizing that "takings claims … come in a variety of forms arising from a variety of fact pattern, some of which fit less than comfortably into the regulatory or physical takings dichotomy." In so holding, the Federal Circuit rejected the *Abrahim-Youri* plaintiffs' syllogism that because they had a property interest, and the government took their property and undervalued it, those plaintiffs were necessarily entitled to compensation for such taking.

Appx7-8 (citations omitted). The "syllogism" that the Federal Circuit panel rejected in 1997—that the transfer of a protected property interest to the United States is a categorical taking that imposes a categorical duty upon the government to pay just compensation—is the precise syllogism that the Supreme Court mandated in 2015 in *Horne*. *Horne*, 135 S. Ct. at 2426.

a. When The United States Seizes Private Property, the Fifth Amendment Imposes a Categorical Duty Upon <u>The Government To Pay Just Compensation</u>

The Supreme Court held in *Horne* that when the government seizes protected private property of any type, the Fifth Amendment imposes a categorical duty upon the government to pay just compensation: "[t]he Government has a

categorical duty to pay just compensation when it takes your car, just as when it takes your home. . . . ***It protects 'private property' without any distinction between different types***." *Id.* at 2426 (emphasis added); *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (citing *Horne* and confirming that "[t]he Takings Clause of the Fifth Amendment guarantees just compensation when private property is taken for public use [and] protects 'private property' without any distinction between different types") (quotations and citation omitted).

*Horne* concerned a Department of Agriculture rule that required raisin growers to reserve a certain percentage of their crop for the government. Title to the reserve raisins passed to the government. 135 S. Ct. at 2428. The Supreme Court held that when title to the raisins passed to the government, there had been a *per se* taking (true whenever private property is transferred to the government). *Id.* at 2426-2430. Once that happened, the Supreme Court held, the Fifth Amendment imposed a categorical duty upon the government to pay just compensation to the raisin growers (as it must in connection with any per se taking). *Id.* Just as it did in *Horne*, the government's seizure of the private property of the Alimanestianu Plaintiffs here effected a *per se* taking.

The Supreme Court rejected the argument that the *per se* taking regime applies only when the government appropriates real property. Chief Justice Roberts, for the majority, wrote:

> [P]eople still do not expect their property, real or personal, to be actually occupied or taken away. Our cases have stressed the longstanding distinction between government acquisitions of property and regulations. The different treatment of real and personal property in a regulatory case suggested by *Lucas* did not alter the established rule of treating direct appropriations of real and personal property alike.

*Id*. at 2427-2428 (citations and quotations omitted). The *Horne* per se rule covers all property types; a point explicitly made by the Supreme Court in its framing of the question presented and answer at the beginning of the opinion:

> Whether the government's 'categorical duty' under the Fifth Amendment to pay just compensation when it 'physically takes possession of an interest in property,' applies only to real property and not to personal property.
>
> **The answer is no**.

*Id.* at 2425 (quotations and citation omitted). Although *Horne* involved a physical object—raisins—the Court confirmed that its ruling applied to intangible personal property, pointing to patent rights as the quintessential example of a property interest meriting the full protection of the Takings Clause in the face of a governmental appropriation. *Id.* at 2427.

To be sure, *Horne* emphasizes that personal property (*i.e.*, tangible and intangible property) may be regulated with little risk of triggering the Takings Clause. *Id.* at 2427 ("an owner of personal property ought to be aware of the possibility that new regulation might even render his property economically worthless") (quotations omitted). But if that same property is acquired by the

government, as it was here, a taking has occurred and a categorical duty to compensate arises. *Id.* at 2426 ("the Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home").

b. The Claims Against Libya (and Judgment on Appeal) Were Transferred from the Alimanestianu Plaintiffs to the United States

Prior to August 14, 2008, the claims and judgment on appeal belonged to the Alimanestianu Plaintiffs. The transfer and thus the taking occurred when the government espoused the claims of the plaintiffs against Libya by entering the Libyan Claims Settlement Agreement on August 14, 2008. After the agreement was inked, the Alimanestianu plaintiffs no longer held title to either the claims against Libya or the Judgment; the government did. That is precisely what the government told the D.C. Circuit in 2009, when it successfully intervened in plaintiffs' action against Libya and moved for dismissal:

> The United States' espousal is pursuant to a claims settlement agreement with the Libyan government, reached as part of a restoration of diplomatic relations with Libya, and involving payment by Libya of a large sum for the benefit of U.S. nationals. In espousing the claims against Libya, the United States has made the plaintiffs' claims its own. Because the United States is now the real party in interest, the Court should permit it to intervene in this suit as plaintiff-appellee.

Appx86. And the Trial Court correctly characterized the taking as the seizure and settlement of plaintiffs' claims and not, as the government contended below, the restoration of Libya's sovereign immunity. Appx8 (the "taking [is] based on the

United States Government's espousal of its nationals' claims against a foreign government and settlement of those claims").[4]

Even if the United States had not restored Libya's sovereign immunity, Libya could have obtained dismissal of the plaintiffs' lawsuit by reference to the Claims Settlement Agreement which, together with its payment to the United States, compromised what had formerly been plaintiffs' claims and judgment. The espousal here is a physical taking, equivalent to the taking at issue in *Horne*, 135 S. Ct. at 2428 ("the reserve requirement imposed by the Raisin Committee is a clear physical taking. Actual raisins are transferred from the growers to the Government. Title to the raisins passes to the Raisin Committee"). And just as the raisin growers in Horne lost "the entire 'bundle' of property rights in the appropriated raisins," *Id*., the plaintiffs here lost the entire bundle of property rights in the appropriated claims and judgment.

* * *

[4] The key distinction between this case and the related *Aviation* case is that the United States did not acquire the claims of the foreign plaintiffs in *Aviation*. *See supra* at 17-18. The taking at issue in *Aviation* is a true regulatory taking. The *Aviation* plaintiffs, unlike the *Alimanestianu* Plaintiffs, are still free to assert their claims in any available jurisdiction. This is made clear in Executive Order 13,477, which terminated all lawsuits against Libya in the United States: "Neither the dismissal of the lawsuit, nor anything in this order, shall affect the ability of any foreign national to pursue other available remedies for claims coming within the terms of Article I in foreign courts or through the efforts of foreign governments." Appx134. At most, the *Aviation* plaintiffs complain about the loss of a forum to litigate their claims.

Accordingly, the government's appropriation of the claims (or judgment on appeal) of the Alimanestianu Plaintiffs is a *per se* taking that gives rise to a categorical duty to pay just compensation.

**2. In Light of the Property Transfer from the Alimanestianu Plaintiffs to the Government, the *Penn Central* Factors Are Precluded by *Horne***

Despite the government's appropriation of plaintiffs' property, the Trial Court engaged in a *Penn Central* regulatory takings analysis (Appx6-8); the precise exercise eschewed by the Supreme Court in *Horne*. The Trial Court relied almost exclusively on *Abrahim-Youri,* a Federal Circuit case preceding *Horne* by nearly two decades:

> Without concluding that the Government's espousal and settlement of the Abrahim–Youri plaintiffs' claims constituted a regulatory taking, the Circuit nonetheless pragmatically looked to the Penn Central factors as relevant to its analysis. The Court found the Penn Central factors relevant, recognizing that "takings claims ... come in a variety of forms arising from a variety of fact patterns, some of which fit less than comfortably into the regulatory or physical takings dichotomy." In so holding, the Federal Circuit rejected the Abrahim–Youri plaintiffs' "syllogism" that because they had a property interest, and the Government took their property and undervalued it, those plaintiffs were necessarily entitled to compensation for such taking.
>
> Given the striking similarities between Abrahim–Youri and the instant case, this Court, consistent with Abrahim–Youri, considers the Penn Central factors as relevant in assessing whether Plaintiffs established a compensable taking.

Appx7-8 (citations omitted). The Trial Court's approach may have been justifiable prior to *Horne*, as the applicability of the per se rules to personal

property was unclear. *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152 (Fed. Cir. 2014) (noting uncertainty in the rules but declining to reach whether categorical takings test applies to appropriated intangible property).

But *Horne* resolved the question. And the Trial Court's exclusive reliance on a set of cases superseded by *Horne* was error. *See, e.g., Belk*, 858 F. 2d 706; *Abrahim-Youri*, 139 F.3d 1462 ; Appx7-8. Whatever takings paradigm these cases imposed upon litigants in the Federal Circuit prior to *Horne,* they no longer govern the rules applicable to a direct government appropriation of property protected by the Takings Clause. A quick review of the chronology highlights the evolution of the relevant rules:

First, in 1988, the Federal Circuit was confronted with a takings claim arising out of the government's appropriation of claims held by individuals kidnapped in Iran against their Iranian captors. *Belk,* 858 F.2d 706. The Federal Circuit analyzed the asserted taking there under the traditional *Penn Central* factors. *Id.* at 708-710.

In 1992 the Supreme Court held in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886 (1992), that the government must pay just compensation when a regulation deprives an owner of all economically beneficial use of her property unless background legal principles of nuisance or property law

shifted the original expectations of the parties with respect to the regulated property. 505 U.S. at 1027-1031, 12 S. Ct at 2899-2902. *See also Bridge Aina Le'a, LLC v. State Land Use Comm'n*, 2016 U.S. Dist. LEXIS 24224, at *24 (D. Haw. Feb. 29, 2016) (explaining that the principle undergirding *Lucas* is that "[a] regulation that merely formalizes a prohibition already inherent in a state's background principles of nuisance and property law, therefore, does not take anything."); *Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1364 (Fed. Cir. 2000) (explaining that under *Lucas*, when a regulatory taking is determined to be "categorical" the property owner is entitled to a recovery "without regard to consideration of investment-backed expectations . . . subject to the government's defenses under the general rubric of nuisance enunciated in *Lucas*").

In 1997, this Court considered an asserted taking arising out of the government's appropriation and subsequent settlement of contract claims held by commercial actors against Iran. *Abrahim-Youri*, 139 F.3d at 67-68. The Court refined its approach, recognizing that after *Lucas* it would be wrong to subject a taking that results in the complete deprivation of a property interest to the traditional regulatory *Penn Central* analysis. *Id.* at 1465-1468. Citing *Lucas*, the Federal Circuit focused on the background legal principle and expectations of parties who engage in international commerce. *Id.* at 1468. Ultimately, the Federal Circuit found that parties engaged in international commerce do so with

the expectation and understanding that the government might need to intervene for a variety of reasons in ways that affect their commercial interests. *Id.* And in that particular case, "the Government [had] provided an alternative tailored to the circumstances which produced a result as favorable to plaintiffs as could reasonably be expected." *Id.*

In 2015, the Supreme Court explicitly rejected the application of the *Penn Central/Lucas* regulatory paradigm that this Court followed in *Belk* and *Abrahim-Youri* where there is an actual appropriation (*i.e.* a transfer). *Horne*, 135 S. Ct. 2419. The Supreme Court held that any government appropriation of private property (both personal and real) imposes a categorical duty upon the government to pay just compensation. *Id.* at 2425-2428. *Horne* explained why *Lucas* did not apply in cases of a direct appropriation of personal property:

> *Lucas* recognized that while an owner of personal property "ought to be aware of the possibility that new regulation might even render his property economically worthless," such an "implied limitation" was not reasonable in the case of land.
>
> *Lucas,* however, was about regulatory takings, not direct appropriations. Whatever *Lucas* had to say about reasonable expectations with regard to regulations, people still do not expect their property, real or personal, to be actually occupied or taken away. Our cases have stressed the "longstanding distinction" between government acquisitions of property and regulations. The different treatment of real and personal property in a regulatory case suggested by *Lucas* did not alter the

> established rule of treating direct appropriations of real and personal property alike.

*Id.* at 2427-2428 (citations omitted).

The Trial Court's decision to adjudicate the government's appropriation of plaintiffs' property within the regulatory paradigm cannot be reconciled with *Horne*. Nor can the Trial Court decision be saved by the argument that the government could have accomplished the same result achieved by the seizure through regulation (restoration of Libya's sovereign immunity). The Supreme Court firmly shut the door on that line of argument as well:

> The Government thinks it "strange" and the dissent "baffling" that the Hornes object to the reserve requirement, when they nonetheless concede that "the government may prohibit the sale of raisins without effecting a per se taking." Brief for Respondent 35; post, at 2443 (SOTOMAYOR, J., dissenting). But that distinction flows naturally from the settled difference in our takings jurisprudence between appropriation and regulation. A physical taking of raisins and a regulatory limit on production may have the same economic impact on a grower. The Constitution, however, is concerned with means as well as ends. The Government has broad powers, but the means it uses to achieve its ends must be "consist[ent] with the letter and spirit of the constitution."

*Horne*, 135 S. Ct. at 2428. Thus, to the extent *Belk* and *Abrahim-Youri* pointed to a *Penn Central/Lucas* regulatory approach to espousal, that approach is no longer tenable after *Horne.*

### 3. Compensation Received from the Commission Does Not Alter the *Per Se* Takings Analysis

Five of the nine plaintiffs were able to seek compensation from a commission set up by the State Department. But under *Horne,* the ability to obtain some level of compensation for an appropriation is immaterial to the legal question of whether there has been a per se taking. The government had argued in *Horne* that, though it had taken possession of plaintiffs' raisins, proceeds from the sale of the raisins would be distributed back to the plaintiffs, negating a takings claim. The Supreme Court rejected the argument, holding that the mere possibility of recovery through an alternative process, at most, goes to the question of just compensation: "once there is a taking, as in the case of a physical appropriation, any payment from the Government in connection with that action goes, at most, to the question of just compensation." *Id.* at 2428-2429.

Thus, the Trial Court's consideration of the commission awards as a crucial factor was error. Appx9-10. Following *Horne*, an award from the Commission goes solely to the question of just compensation.

### 4. Horne's Categorical Rule, as Applied to the Espousal of Claims, Aligns with the Historical Understanding of the Takings Clause, Found in the Court of Claims Decision, Gray v. United States

The Claims Settlement Agreement is not the first international treaty or agreement to implicate the private claims of U.S. citizens against a foreign state.

There have been other instances where the United States espoused and compromised claims of its nationals against other nations. One of the earliest such instances occurred in the so-called French Spoliation cases, arising out of the state of quasi-war between the United States and France in the late 1790s.

During the quasi-war, French privateers seized American merchant vessels on the high seas. In the context of negotiations to end that conflict, France demanded that the United States reaffirm several earlier treaties in which the United States granted France certain privileges. The demand was unpalatable to the United States, as it would have brought the country into direct conflict with Great Britain. The United States, for its part, demanded that France pay damages to the U.S. merchants for losses stemming from France's seizure of American merchant vessels. The parties eventually agreed that the United States would renounce the claims of its citizens for damages against France, while France would drop its demand that the United States affirm its earlier treaties with France. *See generally Gray v. United States*, 21 Ct. Cl. 340 (1886).

That agreement, however, left the aggrieved U.S. merchants without recourse against France; their only recourse was against the United States for an unconstitutional taking. The majority of such claims languished for decades as no court had jurisdiction. But in 1885 Congress conferred limited jurisdiction upon

the Court of Claims to determine whether the renouncement constituted a taking and, if so, the amount owed by the United States.

The primary Court of Claims decision arising out of the 1885 act is *Gray*. *Gray* held that the renouncement of the claims of U.S. nationals against France was unquestionably a taking that required the payment of just compensation:

> [T]he citizen whose property is thus sacrificed for the safety and welfare of his country has his claim against that country; he has a right to compensation, which exists even if no remedy in the courts or elsewhere be given him. A right often exists where there is no remedy, and a most frequent illustration of this is found in the relation of the subject to his sovereign, the citizen to his Government.
>
> It seems to us that this "bargain" (again using Madison's word), by which the present peace and quiet of the United States, as well as their future prosperity and greatness were largely secured, and which was brought about by the sacrifice of the interests of individual citizens, falls within the intent and meaning of the Constitution, which prohibits the taking of private property for public use without just compensation. We do not say that for all purposes these claims were "property" in the ordinarily accepted and in the legal sense of the word; but they were rights which had value, a value inchoate, to be sure, and entirely dependent upon adoption and enforcement by the Government; but an actual money value capable of ascertainment . . .

*Id.* at 392-393.

The timing of the putative taking in *Gray,* and the importance of the underlying treaty with France to the young Republic, gave the court the benefit of the views of two of the most influential legal minds of the founding generation:

James Madison, the drafter of the Takings Clause, and Chief Justice John Marshall. Both Marshall and Madison supported the view that the Fifth Amendment required the United States to pay just compensation when it bargained away the individual claims of its citizens against France. *Id.* at 390.

*Gray* also relied upon the writings of the highly influential legal scholar Emer de Vattel.[5] Vattel wrote in his seminal treatise The Law of Nations that "the necessity of making peace authorizes the sovereign to dispose of the property of individuals and the eminent domain power gives him a right to do it . . . but as it is for the public advantage that he thus disposes of them, the state is bound to indemnify the citizens who are sufferers by the transaction." Book IV, Ch. 2, § 12; *see also Gray*, 21 Ct. Cl. at 391.

*Gray*'s holding tracks the intent of the founding generation: the Takings Clause requires the payment of just compensation when the United States takes and compromises the claims of its citizens as part of an international agreement.

[5] Vattel's The Law of Nations has been described as "unrivaled" and "authoritative" in its influence on the founding generation. *See, e.g.*, Paul Finkelman, Foreign Law and American Constitutional Interpretation: A Long and Venerable Tradition, 63 N.Y.U. ANN. SURV. AM. L. 29, 45 (2007); Robert J. Reinstein, Executive Power and The Law Of Nations in the Washington Administration, 46 U. RICH. L. REV. 373, 404 (2012); Peter Onuf & Nicholas Onuf, Federal Union, Modern World: The Law of Nations in an Age of Revolutions 1776-1814, at 11 (1993) (discussing influence of international writers and stating that Vattel's work "was unrivaled... in its influence on the American founders"). Vattel's work has also been cited in nearly 200 cases by the Supreme Court, most recently by Justice Kennedy in 2015.

*Horne* merely realigns modern Takings Clause jurisprudence with that historical understanding.

### C. Even if, *Arguendo,* the Regulatory Paradigm Followed By *Abrahim-Youri* Applies, Plaintiffs Still Establish a Compensable Taking

When this Court last considered a putative taking arising out of an espousal, it engaged in a regulatory takings analysis within the *Lucas* paradigm. *Abrahim-Youri,* 139 F.3d at 1467-1468*; Supra* at 40-44. The Court held that the United States had an inherent power to regulate and adjust commercial transactions between its citizens and foreign governments. *Abrahim-Youri,* 139 F.3d at 1468. And because of those inherent "background principles," the Court did not view the government's interference with the plaintiffs' property interests (breach of contract claims against Iran) as a compensable taking, despite the fact that the government seized and extinguished those claims.

Central to the Court's finding, however, was the recovery plaintiffs were able to achieve through the commission process set up by the United States. All of the plaintiffs in Abrahim-Youri prevailed before the commission and received 100% of the principal awarded. But because there were insufficient funds to cover 100% of the interest awarded, they claimed that there had been a taking. The Federal Circuit disagreed, holding that there was no taking because the result of the referral to the commission, which resulted in the award of 100% of the principal and 33% of the interest, was just given the circumstances: "[h]ere, though the

choses in action were extinguished, the Government provided an alternative tailored to the circumstances which produced a result as favorable to plaintiffs as could reasonably be expected. *Id.*

### 1. The Commission Did not Provide Reasonable Compensation for the Plaintiffs

The Trial Court, while purporting to follow *Abrahim-Youri*, actually engaged in the traditional *Penn Central* analysis that *Abrahim-Youri* had rejected. Appx6-8 (focusing on investment backed expectations, character of government action, and economic impact). As noted above, *Abrahim-Youri* viewed the property impairment affected by espousal as a complete deprivation, noting that the property interest had been "extinguished," and therefore fit better into the *Lucas* regulatory paradigm (deprivation of all economic use) rather than *Penn Central* (employed in cases of partial impairment). *Abrahim-Youri*, 139 F.3d at 1467-1468. As noted above, *Lucas* provides for a truncated analysis focused on background legal principles that inherently limit the property interest at issue. Under *Lucas*, the complete impairment is a taking unless background legal principles impose inherent limitations on a property right—the limitation identified in *Lucas* is nuisance law. *Lucas*, 505 U.S. at 1028-32.

*Abrahim-Youri* confirms the basic constitutional principle that just compensation must be provided when the claims of U.S. nationals are espoused and settled. And under *Abrahim-Youri* there is a taking unless the government can

show that it provided "an alternative tailored to the circumstances which produced a result as favorable to plaintiffs as could reasonably be expected." *Id.* at 1468. The Trial Court appears to have made that finding: "here, as in *Abrahim-Youri*, the government's action in espousing and settling Plaintiffs' claims gave plaintiffs as much compensation as they likely would have secured had they been left to their own devices." Appx10. The Trial Court offers no factual basis for that finding.

Moreover, the compensation paid to the Alimanestianu plaintiffs, unlike the compensation provided to the plaintiffs in *Abrahim-Youri*, cannot be characterized as reasonable. As compensation for the espoused judgments, the United States elected to pay nothing to four of the Alimanestianu Plaintiffs, $200,000 to four of the plaintiffs, and $10 million to the estate. The taken final judgments held by each plaintiff (or at the very least claims adjudicated and valued by a federal court) ranged in size from $97 million to $300 million. This is plainly not analogous to *Abrahim-Youri*, where the aggrieved had been fully compensated for the principal on their claim, but only partially compensated for the interest that had accrued.

The Trial Court's conclusion that each of these plaintiffs received "as much compensation as they likely would have secured had they been left to their own devices" is confounding. This is particularly the case for the four plaintiffs' who were denied an opportunity to even submit a claim to the commission, and thus

received $0 for the confiscation of their property. As noted below in Section III(C)(3) the seized claims were extremely valuable.

Whether each of the Alimanestianu Plaintiffs received enough compensation for their taken property is, at the very least a triable issue of fact under *Abrahim-Youri*.

**2. The Commission Was Not a True Alternative Forum**

Several cases suggest that, in the regulatory takings context, there may not be a taking if the government simply substitutes one forum for another but leaves the underlying claim or entitlement to relief intact (certainly not what happened to the claims of the Alimanestianu Plaintiffs). In the context of espousal, this might occur if the government refers claims to a commission or arbitration panel for adjudication on the merits. *See, e.g., Dames & Moore*, 453 U.S. at 690 (Stevens, J., concurring) ("possibility that requiring this petitioner to prosecute its claim in another forum will constitute an unconstitutional 'taking' is . . . remote"); *Chas. T. Main Int'l*, 651 F.2d at 814-815 (forced submission of claims against Iran for arbitration would "constitute a 'taking' of property only if the alternative method of satisfying the claim (*i.e.*, submission to the Tribunal) is demonstrably and measurably inferior to the rights otherwise available"); *Marks*, 15 Cl. Ct. at 612 (agreement prohibiting adjudication of claim against Iran "in any forum other than

the Tribunal does not amount to a taking [because] [p]laintiffs had an alternative forum, and an opportunity for a remedy").

The referral at issue in *Abrahim-Youri* ("for final evaluation and determination of amount") might be viewed as a referral that substituted one forum (international arbitration) for another (the commission). 139 F.3d at 1464. In that case, the commission was tasked with adjudicating the merits of the underlying claims between the small claimants and Iran:

> The Commission concluded its adjudication of the small claims by February 1995. The proceedings held before the Commission were ex parte; Iran was not a party to the proceedings, but did provide numerous documents to the Commission. A total of 3,066 claims were resolved, and 1,000 of the claims were upheld. The successful claimants received awards plus interest, measured from the date of Iran's wrongful act until June 22, 1990, the effective date of the Settlement Agreement.

*Id.*

The proceedings before the Commission here, however, did not in any way approximate an alternative forum. The Commission was not set up as an alternative forum to adjudicate claims. The Commission appeared to function primarily in an administrative capacity: to determine whether a claimant met basic threshold requirements for entitlement to compensation established by the State Department (*e.g.*, U.S. citizen, close relative of victim, alive at time of referral, pending claim against Libya in U.S. Court that had been withdrawn). And the

actual amounts ultimately awarded were established neither by the Commission nor by the merits of the underlying claims against Libya; they were predetermined and constrained by the rules set up by the State Department.

The uneven nature of the awards—given the nearly identical nature of the taken property—further highlights the arbitrariness of the State Department referral to the commission. As noted above, four of the Alimanestianu Plaintiffs could not meet the threshold requirements established by the State Department and thus were provided no forum and no compensation. The other four received a State Department recommended payment of $200,000. And one of the plaintiffs received the State Department recommended payment of $10,000,000. There was no true independent adjudication or valuation of the claims by the Commission.

A hypothetical using real property illustrates the infirmity (at least from a Fifth Amendment perspective) of the process set up by the government. Substitute nine nearly identical homes for the set of claims and judgments taken from the nine Alimanestianu Plaintiffs. Rather than determine the value of each home, the government sets up a commission with a discrete fund from which the former homeowners can seek compensation. Unfortunately, four of the nine homeowners do not even meet the jurisdictional threshold to seek compensation from the commission and are denied any restitution for their property. Four others received a pre-determined payment of $200,000, a payment divorced from an analysis of the

value of their homes. And one of the former homeowners received $10,000,000. Such a process would not represent a true adjudication of the value of the confiscated property that would insulate the government from a Fifth Amendment challenge.

The United Sates cannot point to the Commission as a *bonafide* alternative forum. In a similar vein, the Trial Court's assessment of the forum—that it "cannot be said that the alternative forum provided to Plaintiffs here was demonstrably and measurably inferior to plaintiffs"—is plainly erroneous. A *forum* that is unavailable, as the commission was to four of the Alimanestianu Plaintiffs, is plainly inferior.

**3. There is No Basis in the Record For the Trial Court's Evident Attempt to Value Plaintiffs' Claims**

The Trial Court's flawed regulatory takings analysis relied on its apparent conclusion that the value of plaintiffs' property was essentially zero:

- "even after succeeding in their District Court action, Plaintiffs had no reasonable expectation to secure monetary payment."
- "Plaintiffs lacked a realistic expectation that of actually collecting their $1.3 billion judgment."
- "The Government's conduct benefited Plaintiffs economically here."

Appx8-9.

There is no factual basis in the record for the Trial Court to value plaintiffs' property interests. Critically, neither party offered any evidence as to what the

claims against Libya were worth at the time of the taking. *See Horne*, 135 S. Ct. at 2433 ("our cases have set forth a clear and administrable rule for just compensation: The Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking'") (citation omitted).

There is a robust industry that has developed around the sale of claims and judgments. Thus, an expert in the industry would surely be able to value the claims against Libya at the time of the government's taking—a valuation that would focus on the collectability of such a judgment in part based on known Libyan assets in the United States and elsewhere. This process would be akin to an appraiser assessing the value of a home at the time of a taking.

The government has not even tried to offer evidence on the value of the claims. And on summary judgment, they must not only assert a factual basis to value the claims at zero, they must further demonstrate that there is no factual dispute concerning the value of the claims. They have not even tried to meet their burden.

## CONCLUSION AND RELIEF

The Court should uphold the Trial Court's ruling that the Alimanestianu Plaintiffs possess a cognizable property under the Takings Clause. The Court should reverse the Trial Court's finding that the Alimanestianu Plaintiffs have not

established a compensable taking under the Fifth Amendment. The Court should grant partial summary judgment to the Alimanestianu Plaintiffs on the issue of liability. The Court should remand the case to the Trial Court for further proceedings to determine "just compensation" for each plaintiff.

Dated: New York, New York
April 24, 2017

Respectfully submitted,

/s Richard N. Chassin

Richard N. Chassin, Esq.
Jesse T. Conan, Esq.
BECKER, GLYNN, MUFFLY,
CHASSIN & HOSINSKI LLP
299 Park Avenue
New York, New York 10171
rchassin@beckerglynn.com
jconan@beckerglynn.com
Tel: (212) 888-3033
Fax: (212) 888-0255

*Attorneys for Plaintiffs*

# ADDENDUM

# In the United States Court of Federal Claims

**No. 14-704C**
**(Filed: December 29, 2016)**

| | |
|---|---|
| **ALEXANDER ALIMANESTIANU, et al.,**<br>**Plaintiffs,**<br>**v.**<br>**THE UNITED STATES,**<br>**Defendant.** | **Fifth Amendment Taking; Nonfinal Judgment; Property Interest; Settlement and Espousal of Claims Against Libya; Per se Taking; Regulatory Taking; Penn Central factors.** |

Richard N. Chassin, Michael Zeb Landsman, and Jesse T. Conan, Becker, Glynn, Muffly, Chassin & Hosinski LLP, 299 Park Avenue, 16th Floor, New York, NY 10171, for Plaintiffs.

Benjamin C. Mizer, Robert E. Kirschman, Jr., Reginald T. Blades, Jr., and L. Misha Preheim, United States Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

---

## OPINION AND ORDER[1]

---

**WILLIAMS**, Judge.

Plaintiffs in this Fifth Amendment taking case are family members of Mihai Alimanestianu, who was killed in 1989, when, in an act of state-sponsored terrorism, the Socialist People's Libyan Arab Jamairya ("Libya") bombed United Trans Aeriens Flight 772. Plaintiffs were awarded a nearly $1.3 billion judgment against Libya for the wrongful death of Mihai Alimanestianu. Pugh v. Socialist People's Libyan Arab Jamahirya, 530 F. Supp. 2d 216, 267-68 (D.D.C. 2008), vacated, Nos. 08-5387, 08-5388, 2009 WL 10461206, at *1 (D.C. Cir. Feb. 27, 2009) (per curiam). Plaintiffs allege that the Government effected a taking by espousing and settling their claims with Libya and obtaining a vacatur of their judgment.

As part of the United States' settlement with Libya, Plaintiffs' claims were referred to the Foreign Claims Settlement Commission, and Plaintiffs received compensation of just over $10 million. Because Plaintiffs' settlement is far less than the $1.3 billion judgment they were awarded

---

[1] This is the second opinion in this action. On October 29, 2015, the Court denied Defendant's motion to dismiss. Alimanestianu v. United States, 124 Fed. Cl. 126 (2015).

in their District Court action, Plaintiffs assert that the United States owes them additional just compensation for taking their property.

This matter comes before the Court on Defendant's motion for summary judgment and Plaintiffs' cross-motion for partial summary judgment. Because there are no genuine issues of material fact and Plaintiffs have failed to establish a compensable taking as a matter of law, Defendant's motion for summary judgment is granted.

**Background**[2]

Plaintiffs are family members of Mihai Alimanestianu, who was killed in the 1989 explosion of United Trans Aeriens Flight 772 caused by Libya in an act of state-sponsored terrorism. Compl. ¶¶ 10-11. At the time of the explosion in 1989, there was no exception to the Foreign Sovereign Immunities Act ("FSIA") for state sponsors of terrorism, and Libya was immune from suit in the United States. In 1996, Congress amended FSIA to include an exception permitting claims for money damages for personal injury or death caused by acts of foreign sovereigns designated as state sponsors of terrorism. 28 U.S.C. § 1605(a)(7) (1996).

In 2002, Plaintiffs filed suit stemming from Mr. Alimanestianu's death in the United States District Court for the District of Columbia against Libya and six high-ranking Libyan officials.[3] On January 24, 2008, the District Court granted summary judgment in Plaintiffs' favor and on August 8, 2008, entered final judgment, awarding Plaintiffs approximately $1.3 billion.[4]

The defendants in the Pugh action filed a notice of appeal on August 14, 2008. Pugh v. Socialist People's Libyan Arab Jamahiriya, Nos. 08-5387, 08-5388 (D.C. Cir.) (consolidated). That same date, "[i]n order to further the process of normalization of relations" the United States entered into a "Claims Settlement Agreement" with Libya. Def.'s App. A1. The objective of the Agreement was to:

> (1) Reach a final settlement of the Parties' claims and those of their nationals (including natural and juridical persons);
>
> (2) Terminate permanently all pending suits (including suits with judgments that are still subject to appeal or other forms of direct judicial review); and
>
> (3) Preclude any future suits that may be taken to U.S. and Libyan courts.

Id.

---

2 This background is derived from Plaintiffs' Complaint and the appendices and exhibits to the parties' motions papers.

3 The Libyan officials sued in their individual capacities were Abdallah Senoussi, Ahmed Abdallah Elazragh, Ibrahim Naeli, Abras Musbah, Issa Abdelsalam Shibani, and Abdelsalam Hammouda El Ageli.

4 Plaintiffs were joined in the Pugh action by similarly situated parties. The total award to all Pugh plaintiffs was $6,903,683,445.

The Agreement established a humanitarian settlement fund. Id. at A2. The United States deposited $300 million into the fund which was to be used to compensate Libyan victims of United States airstrikes. Libya deposited $1.5 billion into the fund. Id. at A4. The $1.5 billion included "$681 million . . . to ensure fair compensation for the claims of nationals of the United States for wrongful death or physical injury in those cases described in the Act which were pending against Libya . . . as well as other terrorism-related claims against Libya." Id. at A6. Each country agreed to accept these funds "as a full and final settlement of its claims and suits and those of its nationals," and each party was required to "[s]ecure . . . the termination of any suits pending in its courts . . . (including proceedings to secure and enforce court judgments), . . . preclude any new suits in its courts," and restore "sovereign, diplomatic and official immunity to the other Party . . . ." Id. at A2.

In 2008, Congress enacted the Libyan Claims Resolution Act. Pub. L. No. 110-301, 122 Stat. 2999 (2008) ("LCRA"). The LCRA codified the Agreement and provided that, upon the United States' receipt of funds pursuant to the Claims Settlement Agreement, sovereign immunity would be restored to Libya. Id. The LCRA provided that the funds had to be sufficient to ensure "fair compensation of claims of nationals of the United States for wrongful death or physical injury . . . ." Id.

On October 31, 2008, the Secretary of State certified receipt of the Libyan funds, and President George W. Bush issued Executive Order No. 13,477, providing that any pending suit by United States nationals and any pending suit in the United States by foreign nationals within the terms of the Claims Settlement Agreement – "including any suit with a judgment that is still subject to appeal . . . shall be terminated." Pls.' Mot. Ex. 5, at A99. The State Department established a fund to compensate individuals with wrongful death or personal injury claims against Libya caused by acts of state-sponsored terrorism and provided that the Foreign Claims Settlement Commission would adjudicate and render final decisions on claims of U.S. nationals referred to the Commission by the Secretary of State. 22 U.S.C. § 1623(a)(1)(C) (1998). The Commission was obligated to first apply the "provisions of the applicable claims agreement" and then apply "[t]he applicable principles of international law, justice, and equity." § 1623(a)(2).

At the time of the Claims Settlement Agreement, the enactment of the LCRA and the referral of claims to the Commission, the appeal in Pugh was proceeding in the United States Court of Appeals for the District of Columbia Circuit. On January 9, 2009, the United States filed a "motion to intervene, vacate judgment, and dismiss [the] suit with prejudice," arguing that, pursuant to the LCRA, the Claims Settlement Agreement, and Executive Order No. 13,477, U.S. Courts no longer had jurisdiction over terrorism-related claims against Libya. Pls.' Mot. Ex. 5, at A62-63. In its motion to intervene, the Government stated that it "espoused the terrorism-related claims of U.S. nationals against Libya, including plaintiffs' claims," and "made the plaintiffs' claims its own." Id. at A63. The Government further noted in this motion that administrative proceedings established by the Secretary of State for any terrorism-related injuries caused by Libya were available for U.S. nationals to seek compensation. Id. at A71-72.

On February 27, 2009, the D.C. Circuit granted the Government's motion to intervene, vacated the judgment in Pugh, and directed the District Court to dismiss the case. Pugh v. Socialist People's Libyan Arab Jamahiriya, 2009 WL 10461206, at *1. On March 6, 2009, the District Court dismissed the Pugh action with prejudice.

The State Department determined that a $10-million payment per death to the estates of individuals who died in acts of Libyan sponsored terror was fair compensation, and the estate of Mihai Alimanestianu received $10 million. Compl. ¶ 37. Following such payment to all of the estates, the State Department established seven additional categories of claims for referral. Pls.' Mot. Ex. 6, at A105-07. On December 11, 2008, pursuant to his discretionary authority under 22 U.S.C. § 1623(a)(1)(C), the legal advisor to the Secretary of State referred one category of claims (physical injury) to the Commission for adjudication and certification. Id. at A105. On January 15, 2009, the State Department sent a referral letter to the Commission, referring six additional categories of claims (Categories A, B, C, D, E, and F) and requesting that the Commission make determinations on those claims. Id.

Plaintiffs brought claims pursuant to Category B, which covered "claims of U.S. nationals for mental pain and anguish who are living close relatives of a decedent whose death formed the basis of a death claim compensated by the Department of State," and had been the subject of pending litigation against Libya that was dismissed. Id. at A106.

The Commission determined that Mihai Alimanestianu's children should receive $200,000 each. Compl. ¶ 37. The Commission denied compensation to the estates of Mihai Alimanestianu's brothers under Category B, because the brothers were not living at the time of the referral and to Ioana Alimanestianu, because as the beneficiary of the Estate of Mihai Alimanestianu, she was "eligible for compensation from the associated wrongful death claim." Pls.' Opp'n 10; Pls.' Mot. Ex. 6, at A106.

Plaintiffs, along with the other Pugh claimants, also sought additional compensation under Category C, permitting claimants with prior U.S. Court judgments to seek additional compensation, so long as the pending litigation against Libya had been dismissed. Pls.' Mot. Ex. 6, at A106. On May 16, 2012, the Commission denied the claims of all Category C claimants, concluding that no special circumstance warranted additional compensation. Def.'s App. A12. In a May 31, 2012 letter, Plaintiffs, along with other claimants, objected to the Commission's Proposed Decision, submitted a consolidated brief with supporting exhibits, and presented argument at an oral hearing the Commission held on the claimants' objections. Id. at A12-13.

On February 15, 2013, after it "reviewed all of the documents in the record and carefully considered claimants' arguments," the Commission issued a Final Decision, again denying the claimants' request for additional compensation. Id. at A11-A46. In its Final Decision, the Commission concluded:

- The Claims Settlement Agreement, the LCRA, and the Secretary of State's Certification of the agreement established that the parties to the Agreement intended it to "satisfy the compensatory expectations of the two groups of claimants [those with settlements and those with cases pending], identified in . . . the LCRA" and did not intend additional funds for those who had a prior court judgment;

- Because the Commission was tasked with determining whether the "mere existence" of a prior judgment entitled claimants to additional compensation, not whether a particular judgment warranted additional

compensation, the fact that claimants' damages exceeded the compensation they had received was irrelevant;

- Claimants did not submit sufficient evidence indicating that the United States received extra funds from Libya because of their judgment; and

- Claimants' assertion that their judgment was a "catalyst" for the Claims Settlement Agreement, enough to warrant additional compensation, was unpersuasive.

Id. at A37-38, A42-45. Following the Commission's denial of their claims for additional compensation, Plaintiffs filed the instant action.

**Discussion**

**Legal Standard for Summary Judgment**

In granting a motion for summary judgment, a court must find that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine dispute is one which "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit . . . ." Id. at 248. The moving party bears the burden of establishing the absence of any genuine issue of material fact. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once the burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. 256-57. When considering a motion for summary judgment, the court draws all factual inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

When opposing parties both move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus, 812 F.2d at 1391. At the summary judgment phase, the court may not weigh any evidence but only "determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249.

**The Law of the Case Doctrine Does Not Apply**

Plaintiffs assert that under the law of the case doctrine, the Court should not revisit its decision denying Defendant's motion to dismiss, finding that Plaintiffs had sufficiently plead a cognizable property interest. Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (internal citation and quotation marks omitted). The purpose of the rule is to "encourage[] both finality and efficiency in the judicial process by preventing relitigation of already-settled issues." Banks v. United States, 741 F.3d 1268, 1276 (Fed. Cir. 2014).

However, as Defendant argues, a motion for summary judgment requires consideration of different "legally relevant factors" than a motion to dismiss. "An initial denial of a motion to dismiss does not foreclose, as the law of the case, the court's later consideration of those same claims on summary judgment." Athey v. United States, 123 Fed. Cl. 42, 50 (2015). As the Court explained in Gould, Inc. v. United States, the law of the case on a decision denying a dismissal is simply the Court's determination that a plaintiff's "allegations survive a motion to dismiss." 66 Fed. Cl. 253, 266 (2005). "Whether the merits of those very same claims survive summary judgment is an entirely different and undecided matter." Id. As such, the Court's denial of Defendant's motion to dismiss has no preclusive effect for purposes of the summary judgment phase of the case.

**Legal Standard for Fifth Amendment Taking**

On its face, the Fifth Amendment prohibits the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V. The purpose of this prohibition is to bar the few from shouldering a burden that should be borne by the public as a whole. See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 544 (2005) (noting that it is appropriate to inquire into whether plaintiffs have "been singled out to bear any particularly severe regulatory burden"); Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 124 (1978) (stating that "'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." (internal citation omitted)).

The Constitution "protects rather than creates property interests . . . ." Philips v. Wash. Legal Fund, 524 U.S. 156, 164 (1998). Consequently, to "define the dimensions of the requisite property rights for purposes of establishing a cognizable taking," courts look to "existing rules and understandings" and "background principles derived from an independent source, such as state, federal, or common law." Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992)). "The concept of property for purposes of the [F]ifth [A]mendment has been interpreted broadly and can include 'every sort of interest the citizen may possess.'" Shanghai Power Co. v. United States, 4 Cl. Ct. 237, 240 (1983) (quoting United States v. Gen. Motors Corp., 323 U.S. 373, 378 (1945)).

When the Government takes private property pursuant to a public purpose, it must pay the owner just compensation. See Lingle, 544 U.S. at 538-39 (finding that "where [G]overnment requires an owner to suffer a permanent physical invasion of her property-however minor-it must provide just compensation," and where regulations "completely deprive an owner of all economically beneficial us[e] of her property," the Government must pay just compensation (internal citations and quotation marks omitted)).

**Plaintiffs Have Not Established a Compensable Taking**

**The Standard: Consideration of the Penn Central Factors is Appropriate**

The parties dispute whether Plaintiffs' takings claim should be analyzed as a per se taking or a regulatory taking. Plaintiffs allege that Defendant effected a per se taking of their property, which they characterize as their District Court judgment, when it settled their claims against Libya pursuant to the Claims Settlement Agreement for substantially less than their judgment and transferred their property to the Government. Plaintiffs assert that because they did not receive

just compensation from the United States as a result of the Settlement, they are entitled to $1,286,336,632, the approximate amount of their District Court judgment.

Defendant argues that the Penn Central factors, traditionally applied in the regulatory taking context, govern the Court's determination of whether the Government's espousal and settlement of the claims of United States nationals constitutes a compensable taking. Def.'s Mot. 12, 16-19. In a takings analysis under Penn Central, the Court examines 1) the extent to which the Government's action interfered with the plaintiffs' reasonable investment-backed expectations; 2) the character of the Government's action; and 3) the economic impact of that action on the plaintiffs.

The Federal Circuit in Abrahim-Youri v. United States, recognizing the dichotomy between the legal standards governing per se and regulatory takings, provided guidance on the analytical construct governing takings involving Government claim espousal in the foreign claims settlement context. 139 F.3d 1462, 1465-68 (Fed. Cir. 1997). In Abrahim-Youri, the United States and Iran entered into a Settlement Agreement, under which the United States espoused the small claims of U.S. nationals and later referred those claims to the Commission for consideration and payment. However, in paying the claims, the Commission did not award full interest, and the plaintiffs filed a takings action seeking their unawarded interest. Id. at 1465.

The Federal Circuit in Abrahim-Youri characterized the plaintiffs' causes of action against Iran as "property rights" and acknowledged that these property rights were extinguished (not simply regulated) when the Government espoused and settled their claims.[5] However, the Circuit concluded that a mechanistic application of a per se takings analysis was not appropriate given the nature of the property interest and the context in which the taking occurred. The Abrahim-Youri Court found that, even though the plaintiffs had superficially met the factors in a strict per se analysis, i.e., they had established a property interest that was "extinguished" and did not receive the full value of that property, there was no compensable taking. See id. at 1466-67.

Without concluding that the Government's espousal and settlement of the Abrahim-Youri plaintiffs' claims constituted a regulatory taking, the Circuit nonetheless pragmatically looked to the Penn Central factors as relevant to its analysis. See id. 1465-66. The Court found the Penn

---

[5] Defendant invokes Adams v. United States, 391 F.3d 1212 (Fed. Cir. 2004), to argue that Plaintiffs' District Court judgment does not constitute a cognizable property interest. The Adams plaintiffs asserted that they had a cognizable property interest both in payment of underpaid overtime compensation under the Fair Labor Standards Act ("FSLA") and in their administrative claim before the General Accounting Office ("GAO") to recover such overtime compensation. The Federal Circuit found that the Adams plaintiffs did not have a property interest in their GAO claim because the underlying subject matter of this claim - - entitlement to statutory compensation - - failed to qualify as a recognized property interest. Id. at 1226.

Adams is inapposite because the Adams plaintiffs' cause of action only protected a statutory entitlement to money. In this Court's view, Adams does not impact Abrahim-Youri's dicta that a cause of action against a foreign government that the United States Government espoused as its "claim" and settled, was a property interest. However, in any event, as explained below, even assuming arguendo that Plaintiffs here have a cognizable property interest, there was no compensable taking.

Central factors relevant, recognizing that "takings claims . . . come in a variety of forms arising from a variety of fact patterns, some of which fit less than comfortably into the regulatory or physical takings dichotomy." Id. at 1466 (internal citations omitted). In so holding, the Federal Circuit rejected the Abrahim-Youri plaintiffs' "syllogism" that because they had a property interest, and the Government took their property and undervalued it, those plaintiffs were necessarily entitled to compensation for such taking. Id. at 1465-66.

Given the striking similarities between Abrahim-Youri and the instant case, this Court, consistent with Abrahim-Youri, considers the Penn Central factors as relevant in assessing whether Plaintiffs established a compensable taking.

**The Extent to Which the Government's Actions Interfered with Plaintiffs' Expectations**

In both Abrahim-Youri and the instant case, the plaintiffs claimed a taking based on the United States Government's espousal of its nationals' claims against a foreign government and settlement of those claims for less than their alleged full value. In Abrahim-Youri, the Federal Circuit examined the plaintiffs' reasonable expectations in their choses in action against Iran and determined that although the plaintiffs' choses in action were extinguished, "the Government provided an alternative tailored to the circumstances which produced a result as favorable to the plaintiffs as could reasonably be expected." Id. at 1468.

Similarly here, Plaintiffs had no reasonable expectation for recovery greater than what they received from the State Department and the Commission. After Defendant espoused Plaintiffs' claims pursuant to the Claims Settlement Agreement, Mihai Alimanestianu's estate received $10 million from the settlement fund, and the children of Mihai Alimanestianu received $200,000 each.

In contrast to this actual recovery, Plaintiffs, at the time of Libya's terrorist act, had no reasonable expectation of any recovery at all. Because the jurisdictional rules abrogating Libya's sovereign immunity were enacted after Libya's terrorist act, Plaintiffs could not have sued Libya at the time of the injury or have had any expectation of monetary relief from Libya at that time. Cf. Republic of Iraq v. Beaty, 556 U.S. 848, 865 (2009) (stating, in a non-takings context, that "[t]he President's elimination of Iraq's later subjection to suit could hardly have deprived respondents of any expectation they held at the time of their injury that they would be able to sue Iraq in United States courts" (emphasis in original)). In addition, even after succeeding in their District Court action, Plaintiffs had no reasonable expectation to secure monetary payment from Libya for their claims. Plaintiffs' ability to secure payment was speculative and would have depended upon Plaintiffs' ability to enforce and collect their United States court judgment in Libya. In short, Plaintiffs lacked a realistic expectation of actually collecting their $1.3 billion judgment. As such, the Government's actions in espousing and settling their claims did not interfere with Plaintiffs' reasonable expectations in their cause of action, vacated judgment and claims against Libya.

**The Character of the Government Action**

Permeating the character of the Government actions here are the Government's conduct of foreign relations and exercise of its executive authority to compromise claims of its nationals against foreign governments to further national interests. The context in which the Government

conduct here occurred is an important factor. That context of conducting international affairs colors both the extent of the property interests Plaintiffs have and the reasonableness of any expectations that a taking of these interests would give rise to compensation. Plaintiffs' property interests in their causes of action against foreign governments are necessarily constrained by their own Government's paramount right to conduct foreign affairs and concomitant right to compromise its nationals' claims in the process.

As the Federal Circuit clarified in Abrahim-Youri:

> Certain sticks in the bundle of rights that are property are subject to constraint by the government, as part of the bargain through which the citizen otherwise has benefit of government enforcement of property rights. As the trial court correctly observed, those who engage in international commerce must be aware that international relations sometimes become strained, and that governments engage in a variety of activities designed to maintain a degree of international amity.

139 F.3d at 1468.

The very real potential that the Government might have had to compromise individual nationals' claims against Libya diminishes any reasonable expectation that Plaintiffs would receive full compensation for their claims. As the Supreme Court recognized, "[n]ot infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are 'sources of friction' between the two sovereigns . . . [and] nations have often entered into agreements settling the claims of their respective nationals." Dames & Moore v. Regan, 453 U.S. 654, 679 (1981) (internal citation omitted).

Further, Plaintiffs brought their suit pursuant to the State Sponsor of Terrorism exception to FSIA and the Government's designation of Libya as a state sponsor of terror, which permitted suit against Libya - - a somewhat tenuous jurisdictional grant which could have been (and later was) eliminated by the United States. See Beaty, 556 U.S. at 864-65 (noting that as foreign sovereign immunity "'reflects current political realities and relationships,' . . . [it] generally is not something on which parties can rely 'in shaping their primary conduct.'" (quoting Republic of Austria v. Altmann, 541 U.S. 677, 696 (2004))); see also Shanghai Power, 4 Cl. Ct. at 244. Given this landscape, Plaintiffs had no reasonable expectation that they would receive the full quantum of their District Court judgment in satisfaction of their claims against Libya.

**The Economic Impact of the Government's Conduct on Plaintiffs' Property Rights**

The Government's conduct benefited Plaintiffs economically here. The estate received $10 million and each child received $200,000. See Belk v. United States, 858 F.2d 706, 709 (Fed. Cir. 1988) ("'[W]here, as here, the private party is the particular intended beneficiary of the governmental activity, 'fairness and justice' do not require that losses which may result from that activity 'be borne by the public as a whole,' even though the activity may also be intended incidentally to benefit the public.'" (alteration in original) (quoting Nat'l Bd. of Young Men's Christian Ass'ns v. United States, 395 U.S. 85, 92 (1969))).

Here, as in Abrahim-Youri, the Government's action in espousing and settling Plaintiffs' claims gave Plaintiffs as much compensation as they likely would have secured had they been left to their own devices. As the Federal Circuit recognized:

> Here, though the choses in action were extinguished, the Government provided an alternative tailored to the circumstances which produced a result as favorable to plaintiffs as could reasonably be expected.

139 F.3d at 1468.

It is speculative whether Plaintiffs would have secured any recovery from Libya absent the Government's espousal and settlement of their claims. See United States v. Sperry Corp., 493 U.S. 52, 63 (1989) (stating that plaintiff "benefit[ed] directly from the existence and functions of the Tribunal" because it "assured [plaintiff] that any award made to it, whether as the result of a settlement or otherwise, could be enforced in the courts of any nation and actually paid in this country"). When Plaintiffs' $1.3 billion District Court judgment was espoused, it was still on appeal, and no property had been attached. Here, as in Sperry, Plaintiffs' judgment was not "readily collectible." 493 U.S. at 63 (stating that "[h]ad the President not agreed to the establishment of the Tribunal and the Security Account, [plaintiff] would have had no assurance that it could have pursued its action against Iran to judgment or that a judgment would have been readily collectible."); see In re Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d 31, 49 (D.D.C. 2009) (discussing the "number of practical, legal, and political obstacles [which] have made it all but impossible for plaintiffs in these FSIA terrorism cases to enforce their default judgments against Iran").

As the United States Court of Appeals for the First Circuit observed:

> There may well be situations when the President's extinction or "settlement" of a claim against a foreign government, without the consent of the claimant, would constitute a "taking" of private property for public "use." Here, of course, the President has not "extinguished" [Appellant's] claim, but has provided alternative means for its resolution and satisfaction. Thus, his actions could at very most constitute a "taking" of property only if the alternative method of satisfying the claim (i.e., submission to the Tribunal) is demonstrably and measurably inferior to the rights otherwise available to [Appellant] (i.e., the right to attempt to obtain an unsecured judgment in federal court).

Charles T. Main Int'l, Inc. v. Khuzestan Water & Power Auth., 651 F.2d 800, 814-15 (1st Cir. 1981). It cannot be said that the alternative forum provided to Plaintiffs here was "demonstrably and measurably inferior" to Plaintiffs' right to pursue their claims against Libya in federal court and attempt to enforce any judgment sustained on appeal.

Plaintiffs' dissatisfaction with the settlement amount negotiated by the Government and the compensation awarded by the Commission do not establish a compensable taking. See Abrahim-Youri, 139 F.3d at 1468 ("[T]he fact that plaintiffs are not satisfied with the settlement negotiated by the Government on their behalf does not entitle them to compensation by the United States.").

**Conclusion**

Defendant's motion for summary judgment is **GRANTED**.

Plaintiffs' cross-motion for partial summary judgment is **DENIED**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

# In the United States Court of Federal Claims

**No. 14-704 C**

**ALEXANDER ALIMANESTIANU, et al.,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

**JUDGMENT**

Pursuant to the court's Opinion and Order filed December 29, 2016, granting defendant's motion for summary judgment and denying plaintiffs' cross-motion for partial summary judgment,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant.

Lisa L. Reyes
Acting Clerk of Court

**December 30, 2016** By: s/ Anthony Curry

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 24th day of April, 2017, a copy of the foregoing Brief for the Appellant was filed electronically. This filing was served electronically to all parties by operation of the Court's electronic filing system.

____/s/Richard N. Chassin_______

Richard N. Chassin

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Federal Circuit Rule 32(a) or Federal Rule of Federal Circuit Rule 28.1.

☒ This brief contains [*state the number of*] 13,312 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), or

☐ This brief uses a monospaced typeface and contains [*state the number of*] ________ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒ This brief has been prepared in a proportionally spaced typeface using

[*state name and version of word processing program*] Microsoft Word 2010 in

[*state font size and name of type style*] Size 14, Times New Roman, or

☐ This brief has been prepared in a monospaced typeface using

[*state name and version of word processing program*] ________ with

[*state number of characters per inch and name of type style*] ________ .

/s/ Richard N. Chassin, Esq.

(Signature of Attorney)

Richard N. Chassin, Esq.

(Name of Attorney)

Attorney for the Appellant

(State whether representing appellant, appellee, etc.)

Apr 24, 2017

(Date)

Reset Fields